CASS COUNTY ELECTRIC COOPERATIVE, INC., a corporation, Plaintiff and Appellee,

v.

WOLD PROPERTIES, INC., a corporation, Defendant and Appellant,

Northern States Power Company, a corporation, Defendant and Appellee,

and

North Dakota Public Service Commission, Defendant.

Civ. No. 9257.

Supreme Court of North Dakota.

Dec. 27, 1976.

Rehearing Denied Jan. 20, 1977.

John D. Kelly, of Vogel, Vogel, Brantner & Kelly, Fargo, for plaintiff and appellee Cass County Elec. Coop., Inc.

J. Philip Johnson, of Pancratz, Wold & Johnson, Fargo, for defendant and appellant Wold Properties, Inc.

Wheeler, Wolf, Wefald & Peterson, Bismarck, and Tenneson, Serkland, Lundberg & Erickson, Fargo, Harold J. Bagley, Minneapolis, Minn., of counsel; argued by R. W. Wheeler, Bismarck, for defendant and appellee Northern States Power Co.

VOGEL, Justice.

This action is one of a continuing series of disputes between, on the one hand, rural electric cooperatives, organized under Chapter 10–13, N.D.C.C., and, on the other hand, private electric utilities, organized under the general corporation statutes of this or other States, which are authorized, if granted certificates of public convenience and necessity or municipal franchises, to provide electric service within this State. Resolution of the disputes in this case requires, but is not necessarily simplified by, reference to our principal cases and statutes which include, in chronological order:

1937 "Electric Cooperative Corporation Act" adopted by Chapter 115, 1937 Session Laws, subsequently codified as Chapter 10–13, North Dakota Revised Code of 1943.

1956 *Williams Electric Cooperative, Inc. v. Montana-Dakota Utilities Co.,* 79 N.W.2d 508 (N.D.1956).

1957 Substantial amendment of Chap. 10–13, N.D.R.C.1943, by Chap. 105, 1957 S.L.

1958 *Cass County Electric Cooperative, Inc. v. Otter Tail Power Co.,* 93 N.W.2d 47 (N.D.1958), construing pre-1957 statutes.

1965 "Territorial Integrity Act" adopted by Chap. 319, 1965 S.L., later codified in Chap. 49–03, N.D.C.C.

1967 *Montana-Dakota Utilities Co. v. Johanneson,* 153 N.W.2d 414 (N.D. 1967), construed Chap. 319, 1965 S.L., and held Sec. 3 unconstitutional.

1969 *Application of Otter Tail Power Co.,* 169 N.W.2d 415 (N.D.1969), established criteria for determination by Public Service Commission of certificates of public convenience and necessity over opposition of rural electric cooperatives.

1971 *Montana-Dakota Utilities Co. v. Divide County School District No. 1,* 193 N.W.2d 723 (N.D.1971).

1974 *Application of Montana-Dakota Utilities Co. [Naaden & MDU v. Hagen],* 219 N.W.2d 174 (N.D. 1974).

1974 *Tri-County Electric Cooperative, Inc. v. Elkin,* 224 N.W.2d 785 (N.D. 1974).

The issue in the case before us now is whether Cass County Electric Cooperative, Inc., a rural electric cooperative (hereinafter Cass Electric), can be required to serve, or is precluded from serving, Wold Properties, Inc. (hereinafter Wold), the owner of a Holiday Inn which was, at the time the action was started, located outside the city limits of Fargo. The trial court held that Cass Electric was precluded from continuing such service on three grounds:

1. That Cass Electric lacked authority to serve Wold because the Holiday Inn was receiving central station service from Northern States Power Company (hereinafter NSP), relying on Section 10–13–01, N.D.C.C.;

2. That Wold was not eligible for membership in Cass Electric because it was receiving central station service from NSP, and therefore could not be served by Cass Electric; and

3. That NSP has the right to furnish electric service to the Fargo Holiday Inn to the exclusion of Cass Electric because NSP holds a certificate of public convenience and necessity.

The statement of the case on appeal is summarized as follows: This action was initiated upon a complaint of Cass Electric, seeking a declaratory judgment as to whether it was legally precluded from providing electric service to Wold. NSP obtained an ex parte temporary restraining order to prevent the disconnection of existing service of NSP or the connection of

electric service by Cass Electric. Upon a hearing, the temporary restraining order was dissolved and the application of NSP for a temporary injunction was denied. The matter was submitted upon stipulation of facts to District Judge Roy K. Redetzke, who issued a memorandum opinion dated June 14, 1976, and findings of fact, conclusions of law, and order for judgment dated June 18, 1976, holding that Cass Electric was not legally authorized to provide electric service because of the PSC certificate of public convenience and necessity and the fact that electric service was being supplied by NSP. Cross-claims and counterclaims between Wold and NSP were dismissed.

The parties have stipulated many of the facts and agreed upon others in their statement of the case on appeal. The stipulation may be summarized: NSP provides electric service within the city of Fargo and is subject to the jurisdiction of the PSC. Wold operates the Holiday Inn upon a tract of 7.6 acres located in Cass County and outside the boundaries of any municipality. Cass Electric operates an electric distribution system serving members in Cass County and adjacent counties of North Dakota. In January 1971, NSP discussed gas and electric service for the then proposed Holiday Inn with Dr. Clifford Wold, one of the organizers of Wold. NSP has provided service to the property since October of 1971. It obtained a certificate of public convenience and necessity from the PSC after application and order. On September 30, 1971, Cass Electric advised the PSC that it had no objection to the granting of such certificate of public convenience and necessity. Prior to that date, representatives of Wold advised Cass Electric that they preferred to have NSP provide electric service to the Holiday Inn. Wold was not otherwise notified or made a party to the PSC proceeding. The original application for electric service to the Holiday Inn was made by the general and electrical contractors engaged in construction of the Holiday Inn, and they executed agreements with NSP without the knowledge or approval of Wold. There were disputes as to natural gas curtailments and cost differentials in

electric service, and Wold, in early March of 1975, requested NSP to terminate electric service and requested Cass Electric to provide such service. On July 23, 1975, Wold made a written demand upon Cass Electric for electric service. After the action was commenced Cass Electric and Wold signed an agreement providing that Cass Electric furnish electric service to Wold "solely to avoid any claim for resulting damage should the court finally determine that Cass Electric is legally obligated to provide said service." On September 21, 1975, an electrical contractor hired by Wold for that purpose disconnected the NSP service. After such disconnection, Cass Electric connected its electric service, without the knowledge or consent of NSP.

There have been three major statutory enactments in this State relating to rural electric cooperatives. The first was in 1937, by Chapter 115, S.L. 1937. It created the general structure under which rural electric cooperatives still operate. It defined "rural area" as

". . . any area not included within the boundaries of any incorporated or unincorporated city, town, village or borough, having a population in excess of twenty-five hundred inhabitants, and includes both the farm and non-farm population thereof."

It provided that rural electric cooperatives could be organized under Chapter 115, S.L. 1937 [now codified as Chapter 10–13, N.D.C.C.],

". . . for the purpose of engaging in rural electrification by any one or more of the following methods:

"(1) The furnishing of electric energy to persons in rural areas who are not receiving central station service.

. . . . .

It gave to such cooperatives the power, among other powers,

"(4) To generate, manufacture, purchase, acquire and accumulate electric energy and to transmit, distribute, sell, furnish and dispose of such

electric energy to its members only, . . ."

and it provided:

"§ 12. *Qualification of Members.*] All persons in rural areas proposed to be served by a corporation, who are not receiving central station service, shall be eligible to membership in a corporation. No person other than the incorporators shall be, become or remain a member of the corporation unless such person shall use or agree to use electric energy or, as the case may be, the facilities, supplies, equipment, and services furnished by a corporation. . . ."

In 1957, by Chapter 105, S.L. 1957, substantial changes were made. The language as to the purposes for which electric cooperatives might be organized became:

"A cooperative may be organized and operated as an electric cooperative under the general law governing cooperatives and this chapter for the purpose of engaging in rural electrification by any one or more of the following methods:

"1. The furnishing of electric energy to persons in rural areas who are not receiving central station service;

. . . . .

(Sec. 10–1301, N.D.R.C.; now codified as Sec. 10–13–01, N.D.C.C.)

The powers were expanded to include the power to serve nonmembers:

"In addition to the powers granted by the general law governing cooperatives, electric cooperatives have the power:

"1. To generate, manufacture, purchase, acquire, and accumulate electrical energy and to transmit, distribute, sell, furnish, and dispose of such electrical energy to its members, and to other persons not in excess of ten per centum of the number of its members, provided, however, that a cooperative which acquires existing electrical facilities may continue service to persons, not in excess of twenty per centum of the number of its members who are already receiving service from such facilities without requiring such persons to

become members but such persons may become members upon such terms as may be prescribed in the bylaws;

. . . . . .

(Sec. 10–1303, N.D.R.C.; now Sec. 10–13–03, N.D.C.C.)

The qualifications for membership remain substantially unchanged. Sec. 10–1304, N.D.R.C.; now Sec. 10–13–04, N.D.C.C.

The definition of "rural area" was altered so as to read that it

". . . means any area not included within the boundaries of an incorporated or unincorporated city or village having a population in excess of twenty-five hundred inhabitants at the time a corporation or cooperative commences to operate electric facilities or to furnish electric energy in such an area, and includes both the farm and nonfarm population thereof; and no change thereafter in the population of a rural area, as defined herein, regardless of the reason for such change, shall operate to affect in any way its status as a rural area for the purposes of this chapter and of chapter 57–33." (Sec. 10–1304, N.D.R.C.; now Sec. 10–13–04, N.D.C.C.)

Except for slight changes in terminology not affecting the meaning, these definitions and statutory provisions remain in effect.

The third major legislation affecting rural electric cooperatives was the "Territorial Integrity Law" of 1965, Chapter 319, S.L. 1965, codified in Chapter 49–03, N.D.C.C. This statute is discussed in *Montana-Dakota Utilities Co. v. Johanneson, supra,* in which one section was held unconstitutional and the remainder was sustained as to constitutionality.

## DECISION

■ In reviewing the North Dakota statutes on the subject, we must recognize that rural electric cooperatives were organized, in part, so as to comply with Federal requirements for Federal loans for rural elec-

trification purposes. The statutory authority for the making of such loans by the Administrator of the Rural Electrification Administration is found in 7 U.S.C. § 902, which provides, in part:

> "The Administrator is authorized and empowered to make loans in the several States and Territories of the United States for rural electrification and the furnishing of electric energy to persons in rural areas who are not receiving central station service . . ."

▄▄▄ One of the peripheral questions in the case before us is whether the language of the State statute [§ 10–13–01, N.D.C.C.] as to a purpose of a rural electric cooperative to furnish electric energy "to persons in rural areas who are not receiving central station service" and the similar language as to qualifications for members [§ 10–13–04, N.D.C.C.] precludes service to nonmembers, in spite of the authorization of service to nonmembers found in Section 10–13–03, subsection 1, N.D.C.C. We hold that a customer need not be a member of the cooperative in order to obtain service, so long as the total number of nonmembers served does not exceed the ten percent or twenty percent limitation applicable under Section 10–13–03, subsection 1. One reason for so holding is that Section 10–13–01 is a general statement of the purposes for which cooperatives may be organized and operated, while Section 10–13–03 is a statute designating specific powers of cooperatives. A cooperative may be organized for the general purpose of serving "rural areas," as defined in the statute, but may yet have the power to serve a limited number of customers who are nonmembers or even nonrural.[1] This distinction is recognized in *Missouri Power & Light Co. v. Lewis County Rural Electric Cooperative Assn.*, 235 Mo.App. 1056, 149 S.W.2d 881 (1941), and in *Otter Tail Power Co. v. Sioux Valley Electric Assn.*, 81 S.D. 99, 131 N.W.2d 111 (1964).

So far as Federal law is concerned, it is also recognized by the continuing loaning of money to North Dakota rural electric cooperatives by the Administrator since the 1957 amendment permitting service to nonmembers. Finally, as pointed out in *Missouri Power & Light Co. v. Lewis County Rural Electric Cooperative Assn., supra,* and *Otter Tail Power Co. v. Sioux Valley Electric Assn., supra,* 7 U.S.C. § 902 does not permit an applicant for a loan to qualify by counting in its project plan persons already receiving service or to count them as potential patrons, but the Federal law does not prohibit legitimate competition between applicant and existing suppliers of central station service if permitted by State law.

▄▄▄ As pointed out in *Tri-County Electric Cooperative, Inc. v. Elkin, supra,* the typical conflict between a public utility and an electric cooperative arises when a potential customer, on or near the edge of a city served by a public utility under a franchise but within a rural area served by a rural electric cooperative, seeks service which each of the suppliers would like to furnish. It was to settle such controversies with a minimum of wasteful duplication and conflict that the Territorial Integrity Act was passed. While this court has declined to say that rural electric cooperatives were given a preference by the Act in service to patrons in rural areas [see *Application of Otter Tail Power Co., supra,* and Addendum by one justice of this court to the opinion in *Tri-County Electric Cooperative, Inc. v. Elkin, supra* ], it is a fact that rural electric cooperatives may serve customers in rural areas unless a certificate of public convenience and necessity is obtained by the public utility from the PSC. *Application of Montana-Dakota Utilities Co., supra.*

The guidelines under which the PSC must make its decision as to the issuance or non-

---

1. Any dicta to the contrary in *Montana-Dakota Utilities Co. v. Divide County School District No. 1, supra,* are hereby disavowed. That case involved only the status of property served by a rural electric cooperative after the property was annexed by a city in which a public utility had the sole electric franchise. The opinion stated that membership of the owner of the property was "unimportant."

issuance of a certificate of public convenience and necessity were first judicially specified in *Application of Otter Tail Power Co., supra,* and have been construed in several cases, most recently in *Tri-County Electric Cooperative, Inc. v. Elkin, supra.*

 One of the factors to be considered by the PSC is that of "customer preference." Wold contends that it should be allowed to exercise its preference to be served by Cass Electric. However, we have held several times that customer preference, while a factor to be considered, is not controlling. It

". . . subjects the customer's preference for a regulated public utility service to an inquiry and decision by the Commission on the question of public convenience and necessity." *Application of Montana-Dakota Utilities Co., supra,* 219 N.W.2d 174, at 181.

The reason, of course, is that unregulated customer preference would result in a wasteful duplication of facilities which the Territorial Integrity Act was intended to minimize. See, as an illustration of how territory was checkerboarded when customer preference was controlling, *Cass County Electric Cooperative, Inc. v. Otter Tail Power Co., supra,* a pre-Territorial Integrity Act case. As we said in *Tri-County, supra,* 224 N.W.2d 785, at 792:

"Certainly, customer preference has nothing to do with selection of a supplier of electricity inside a municipality such as Jamestown, where only one supplier is franchised. In such places the customer must accept service from the franchised supplier unless he chooses to generate his own electricity or go without. . . . It [customer preference] cannot prevail where economic factors, such as relative costs and wasteful duplication, provide other criteria for choice."

We also pointed out in *Tri-County,* at page 792, that

"It is the *public* convenience and necessity, after all, with which the Commission is concerned, not private preference."

Wold points out that Section 49–03–01 provides only that a public utility must obtain a certificate of public convenience and necessity before it can

". . . *begin* in the construction or operation of a public utility plant or system or extension thereof, . . ."

Wold then argues that it may change suppliers even after the public utility has *begun* service to it. In support of this argument it cites *Cass County Electric Cooperative, Inc. v. Otter Tail Power Co., supra; Missouri Power & Light Co. v. Lewis County Rural Electric Cooperative Assn., supra; Heath Springs Light & Power Co. v. Lynches River Electric Cooperative, Inc.,* 231 S.C. 34, 97 S.E.2d 79 (1947); and *Otter Tail Power Co. v. Sioux Valley Electric Assn., supra.* We believe these cases are not applicable. The earlier *Cass County Electric Cooperative* case [93 N.W.2d 47 (1958)] was decided before the Territorial Integrity Act was adopted, and the Missouri, South Carolina, and South Dakota cases were decided in States which had no legislation similar to the Territorial Integrity Act.

 Wold further argues that any statutory interpretation which gives NSP an exclusive right to serve any given customer or area constitutes an impermissible and permanent grant of a franchise or monopoly, which is against public policy and must be clearly expressed by statute in order to be permissible. We believe that the Territorial Integrity Act and the other statutes above quoted constitute a sufficiently specific statement of public purpose to meet the constitutional and statutory requirements. It is, after all, a truism of public utility regulation that wasteful duplication of capital-intensive utility services can best be promoted by regulation which permits monopoly service in specific areas. Furthermore, the grant to NSP is not necessarily permanent. Section 49–05–09, N.D.C.C., provides:

"The commission, at any time, upon due notice to the public utility affected and after opportunity to be heard as provided in the case of complaints, may re-

scind, alter, or amend any decision made by it. Any order rescinding, altering, or amending a prior order or decision, when served upon the public utility affected, shall have the same effect as an original order or decision."

A suggestion is made that Wold is not bound by the certificate of public convenience and necessity because the certificate was not issued to it but was issued to the contractor building the Holiday Inn. We need not decide whether such a certificate applies to persons or to areas, or whether the owner is bound by acts of a construction contractor. The stipulation of the parties shows that representatives of Wold advised Cass Electric that Wold preferred to have NSP provide electric service for the Holiday Inn, and Cass Electric thereafter, on September 30, 1971, advised the PSC that it had no objection to the granting of the certificate of public convenience and necessity to NSP. The contractors contracted with NSP for underground service on or about June 29, 1972, and Wold's first request to NSP to terminate electric service came in early March of 1975. We believe the record shows knowledge and consent on the part of Wold, and ratification by it of the service by NSP and of the authority for providing such service.

## CONCLUSION (MERITS)

The trial court found in favor of NSP on three grounds stated in its conclusions of law, which we reiterate:

1. That Cass Electric lacked authority to serve Wold because the Holiday Inn was receiving central station service from NSP, relying on Section 10–13–01, N.D.C.C.;

2. That Wold was not eligible for membership in Cass Electric because it was receiving central station service from NSP, and therefore could not be served by Cass Electric; and

3. That NSP has the right to furnish electric service to the Fargo Holiday Inn to the exclusion of Cass Electric because NSP holds a certificate of public convenience and necessity.

We affirm on the third ground. As we have indicated, we believe that Section 10–13–01 is a general grant of authority to incorporate and operate for certain primary purposes, and that special authority to serve nonmembers is provided by Section 10–13–03. Eligibility for membership is not a prerequisite for service by a rural electric cooperative so long as the percentage limitations of Section 10–13–03 are not violated. But the provisions of the Territorial Integrity Act, Chapter 49–03, N.D.C.C., are controlling. Since NSP has an unrevoked certificate of public convenience and necessity, Cass Electric is precluded from providing service to Wold.

## MOTION TO STRIKE A PORTION OF CASS ELECTRIC'S BRIEF

At the trial level, Cass Electric took a position agreeing with NSP on most major points now in controversy. At the appellate level, while still supporting the decision of the trial court which was favorable to NSP, Cass Electric changed its position as to the interpretation of the statutes as to rural electric cooperatives, but adhered to the position that it was precluded by the terms of the Territorial Integrity Act from serving Wold. In other words, it supports the position of NSP at the appellate level, but on only one of the several grounds on which it agreed with NSP at the trial level. NSP therefore made a motion in this court to strike that portion of Cass Electric's brief which represents a change of its position at the trial level.

We decline to strike the challenged portion of the brief. The striking of briefs is rarely done, and then only in rather flagrant cases of violation of the rules of the court [*Olson v. Olson,* 180 N.W.2d 427 (Iowa 1970) (argument disregarded)], or going outside the record [*Orso v. City and County of Honolulu,* 55 Haw. 37, 514 P.2d 859 (1973)], or unnecessarily violent, abusive, and disrespectful language [*Bean v. Best,* 77 S.D. 433, 93 N.W.2d 403 (1958)].

We know of no instance in which a brief or a portion of a brief was stricken by this court. We have the power to do so, but find no basis for doing so here.

Nor do we know of any rule or statute which precludes a party from changing position on appeal on some, but not all, of the grounds formerly urged.

Affirmed.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.