In the Matter of the Application of NE-
BRASKA PUBLIC POWER DISTRICT
FOR A CERTIFICATE OF CORRIDOR
COMPATIBILITY FOR A 500 KV AC
ELECTRIC TRANSMISSION FACILI-
TY EXTENDING FROM the CANADI-
AN BORDER NEAR CAVALIER,
NORTH DAKOTA TO the SOUTH DA-
KOTA BORDER NEAR FORMAN,
NORTH DAKOTA.

Civ. No. 10263.

Supreme Court of North Dakota.

Feb. 7, 1983.

Kelsch, Kelsch, Bennett, Ruff & Austin, Sp. Asst. Attys. Gen., Mandan and Ray Walton, Commerce Counsel, PSC, Bismarck, for PSC; argued by Thomas F. Kelsch, Bismarck.

Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, and Crowell & Moring, Washington, D.C. and Gene D. Watson, Gen. Counsel, Nebraska Public Power Dist. Columbus, Neb., for Nebraska Public Power Dist., argued by John D. Kelly, Fargo.

Conmy, Feste, Bossart, Hubbard & Corwin, Fargo, and Hodny, Burke & Rice, Grafton, for aggrieved landowners-appellants; argued by David R. Bossart, Fargo.

PEDERSON, Justice.

This is an appeal by aggrieved landowners[1] from a judgment which affirmed a Public Service Commission (PSC) decision granting the Nebraska Public Power District (NPPD) a certificate of corridor compatibility for a 500 kilovolt electric transmission line in eastern North Dakota, commonly known as the MANDAN line, which extends from the Canadian border to the South Dakota border. We affirm.

## I. FACTS

Under Chapter 49–22, NDCC, the North Dakota Energy Conversion and Transmission Facility Siting Act, the first step in siting an electric transmission line is the selection of a six-mile wide corridor, within which a specific line route will later be chosen. The PSC held general informational hearings in the counties through which the MANDAN line corridor transversed— Pembina, . Walsh, Grand Forks, Steele, Barnes, Ransom and Sargent. In addition, seven days of hearings involving expert testimony on the technical aspects of the line were held in Valley City.

The PSC then prepared findings of fact, conclusions of law and an order granting the corridor certificate. The corridor approved by the PSC was wider than the one NPPD applied for as it included an expanded western border. On appeal to the Barnes County District Court, the PSC decisions on the merits and in denying the request for a rehearing were affirmed. This appeal followed.

---

1. At the technical hearings in Valley City, the PSC's hearing examiner required that the landowners' counsel submit a list of the people he was representing. The list is not part of the record so we cannot determine the names of the aggrieved landowners-appellants. In their brief, the landowners claim to be "approximately 600 North Dakota landowners who reside in the seven counties in which MANDAN is proposed to be constructed."

During oral argument, it was suggested that some landowners were denied due process because they did not receive adequate notice. We cannot consider this issue because the record does not disclose everything that was published in the county newspapers and because no named landowner has objected to the notice he received.

## II. APPELLATE REVIEW

In North Dakota the right to appeal is purely statutory. *Young v. White,* 267 N.W.2d 799, 800 (N.D.1978). The Siting Act provides that any party who is aggrieved by the issuance of a certificate, permit, or final order of the PSC may request a rehearing. Section 49–22–19, NDCC. The Siting Act also states that there is a right to appeal to the district court from any adverse ruling by the PSC. *Id.*

■ The Administrative Agencies Practice Act, Ch. 28–32, NDCC, similarly states that any party aggrieved by the decision of an administrative agency may request a rehearing by the agency. This language, which corresponds with that in the Siting Act, was interpreted by this court in *Evanson v. Wigen,* 221 N.W.2d 648, 653 (N.D. 1974). We quoted from *Petition of Village Board of Wheatland,* 77 N.D. 194, 221, 42 N.W.2d 321, 336 (1950) as follows: "[T]he statute clearly warrants the conclusion that the legislature did not intend that a request for a rehearing should constitute a prerequisite to an appeal from a final decision of an administrative agency." We interpret § 49–22–19 of the Siting Act similarly in that an aggrieved party may request a rehearing, but is not required to do so before appealing to the district court.

■ From the wording of § 49–22–19 it is not clear if an aggrieved person is always entitled to a rehearing by the PSC upon request. Although the statute states that any aggrieved party "*may* request a rehearing," it also states that the "hearing *shall* be conducted pursuant to chapter 28–32 [the Administrative Agencies Practice Act]." [Emphasis added.] The PSC contends that although any aggrieved party may request a rehearing, the PSC has the option to deny the request pursuant to Chapter 28–32, NDCC. Section 28–32–14 of the Administrative Agencies Practice Act states, in part, that the "administrative agency may deny such request for rehearing . . . ." We do not find error in the position of the PSC. The landowners' request for rehearing is considered under Chapter 28–32, the Administrative Agencies

Practice Act, and may be denied pursuant to § 28–32–14, NDCC.

■ In an appeal from a decision of an administrative agency which has been appealed first to the district court and then to this court, we review the decision of the administrative agency rather than the decision of the district court. *Lee v. Gulf Oil Exploration and Production,* 318 N.W.2d 766, 768 (N.D.1982). Accordingly, in our review we must look to the record compiled before the administrative agency itself. *North Dakota Real Estate Commission v. Allen,* 271 N.W.2d 593, 595 (N.D.1978).

North Dakota Century Code §§ 28–32–19 and 28–32–21 control our review of administrative agency determinations. In this case, unless we find that the "rules or procedure of the agency have not afforded the appellant a fair hearing . . . [t]he findings of fact made by the agency are not supported by a preponderance of the evidence [or] [t]he conclusions and decision of the agency are not supported by its findings of fact," we must affirm. Section 28–32–19, NDCC.

■ In *Power Fuels, Inc. v. Elkin,* 283 N.W.2d 214, 220 (N.D.1979), this court applied the following general principle when reviewing an administrative agency's factfinding: "[W]e do not make independent findings of fact or substitute our judgment for that of the agency. We determine only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record." We must exercise restraint when we review administrative agency findings. *Asbridge v. North Dakota State Highway Com'r,* 291 N.W.2d 739, 744 (N.D.1980). "It is not the function of the judiciary to act as a super board, substituting its judgment for that of the administrator whose decision is being reviewed." *Barnes County v. Garrison Diversion, Etc.,* 312 N.W.2d 20, 25 (N.D.1981). Similarly, we will not substitute our judgment for that of the qualified experts in the administrative agencies. *Bank of Hamilton v. State Banking Bd.,* 236 N.W.2d 921, 925 (N.D.1975).

## III. PSC FINDINGS OF FACT

The PSC made 53 findings of fact and 11 conclusions of law in this case. The landowners contend the PSC erred in four areas, each of which is involved in the central issue of the appeal—the extent of the PSC's power under the Siting Act.

Finding of fact number 25 states that the methodology used by NPPD in its corridor analysis process "was designed to identify a corridor in which the proposed transmission line ... [could] be constructed, operated and maintained in a manner that would minimize overall adverse effects on the environment, consistent with economics and technological considerations." The landowners contend that the proposed corridor was actually selected because it permits the MANDAN line to be constructed in a straight line and thus is the most economical method.

■ We are convinced that finding number 25 is supported by a preponderance of evidence in the record. Because the MANDAN line must cross several states and a Canadian province, the state corridors must meet to form one continuous corridor. A straight corridor from which the route will eventually be chosen will not only lower NPPD's costs, but will also involve fewer acres of North Dakota land and, accordingly, there will be less impact upon the environment and agricultural practices.

The landowners also challenge finding of fact number 38 which involves avoidance areas, exclusion areas, and the "fifty-percent rule." The North Dakota Legislature has determined that transmission facilities affect the environment and welfare of North Dakota citizens. Section 49–22–02, NDCC. The PSC has the duty to minimize these adverse effects. The PSC has identified exclusion areas and avoidance areas to enable it to do so. Section 69–06–08–02, NDAC.

Exclusion areas initially are not eligible for consideration when choosing a transmission line route. They include national, state, and local parks and wilderness areas. Section 69–06–08–02(1), NDAC. Avoidance areas include woodlands (through January

1, 1982), wildlife refuges, game management areas, forests, grasslands, reservoirs, and land within 500 feet of rural residences. Section 69–06–08.02(2), NDAC. Although exclusion and avoidance areas may be located within a corridor, at no given point may they encompass more than fifty percent of the corridor width unless there is no reasonable alternative to that corridor. Section 69–06–08–02, NDAC.

■ In the MANDAN line proposed corridor, there are avoidance areas, consisting mainly of woodlands, which encompass more than fifty percent of the corridor width. The question thus becomes whether or not the PSC's finding that there is no reasonable alternative to the grant of the proposed corridor across the avoidance areas is supported by a preponderance of the evidence. We believe it is. The PSC considered an alternate western corridor, but determined it was not a "reasonable alternative." This conclusion was based, in part, on the fact that the western alternate corridor would involve 44 additional corridor miles.

■ We note that the PSC has recently amended its rules, deleting "woodlands and wooded areas" from its list of avoidance areas. As a result the approved corridor does not violate the current fifty-percent rule.

■ In finding of fact number 53 and conclusion of law number 10, the PSC decided to modify NPPD's proposed corridor by moving the western boundary further west. The landowners contend the PSC did not have the authority to expand the corridor. The PSC is limited to the statutory authority given it by the legislature. *Petition of Village Board of Wheatland, supra,* 77 N.D. at 218, 42 N.W.2d at 335. In this instance, though, the legislature has expressly given the PSC the authority to issue "a certificate of corridor compatibility with such terms, conditions, or *modifications* deemed necessary." Section 49–22–08(5), NDAC. [Emphasis added.] The PSC did not abuse its statutorily granted power when it expanded the MANDAN power line

corridor to the west to provide NPPD with additional routing opportunities.

■ Finally, the landowners contend that the PSC erred when it stated in finding of fact number 46 that "[i]t is not technologically or economically feasible to build the MANDAN transmission line underground." This finding is fully supported in the record by testimony of NPPD's expert witness.

■ The landowners argue that the PSC is required by law to study new technologies such as undergrounding. North Dakota Century Code § 49–22–09 lists factors to be considered by the PSC when evaluating applications and making corridor designations. This section states that "[t]he commission shall be guided by, but is not limited to, the following considerations, where applicable, to aid the evaluation and designation of sites, corridors, and routes: ... The effects of new energy conversion and transmission technologies and systems designed to minimize adverse environmental effects ...." Section 49–22–09, NDCC. This section does not mandate NPPD to present evidence of new technologies, but rather sets out matters that should "guide" the PSC "where applicable."

■ After the PSC granted NPPD the corridor, the landowners petitioned for a rehearing to present additional evidence on undergrounding. The PSC denied the request because the landowners made no reference to and did not attach to their petition studies which established the technological feasibility to build the MANDAN line underground. Section 28–32–14, NDCC, requires that the aggrieved landowners submit with their rehearing request "a statement of any further showing to be made in the proceeding." The landowners have not shown this court that the PSC erred in its refusal to grant a rehearing.

The landowners were allowed to present expert testimony on undergrounding during the original hearings. The new expert evidence the landowners wanted heard by the PSC involved testimony that the line could be designed and constructed underground. However, the PSC concluded that even if the line could be built underground, it was not feasible in this case because of the adverse impact on the land and the excessive cost. The PSC believes that even if the technology exists to build the line underground, it does not have the statutory authority to require NPPD to implement this type of design change.

## IV.  NEED

The PSC concluded as a matter of law that it "does not have the authority or jurisdiction to determine the need for the [MANDAN] line or to deny access across the State of North Dakota." It is the landowners' position that the PSC has the authority and the obligation to determine whether or not a transmission line is needed.

Section 49–22–08, NDCC, lists nine items that must be included in an application for a corridor certificate, including a "statement explaining the need for the facility." The PSC's own Application Guidelines expand this requirement for information about the need for the facility. But, need is not listed in § 49–22–09, NDCC, the section that lists eleven factors by which the PSC is to be guided when it evaluates corridor applications. These listed factors basically involve environmental, social, and economic impacts.

The landowners question the reason for the required statement of need in the application if it is not to be used to determine if a need for the line actually exists. According to the PSC the information is to be used by itself, the public, and the Legislature in planning and scheduling, and it is used to help the PSC understand the nature of the applicant's project. Until the Legislature specifically directs the PSC to use this information to evaluate the need for a line, the PSC believes it does not have the authority to do so.

■ The stated policy in the Siting Act is "to route transmission facilities in an orderly manner compatible with environmental preservation and the efficient use of resources." Section 49–22–02, NDCC. The

Siting Act does not give the PSC the authority to prohibit the construction of transmission lines, but only "to ensure that the location, construction, and operation . . . produce minimal adverse effects on the environment and upon the welfare of the citizens of this state . . . ." Section 49–22–02, NDCC.

The PSC's authority to regulate is limited to that given it by the Legislature. *Williams Electric Coop. v. Montana-Dakota Util. Co.,* 79 N.W.2d 508, 517 (N.D. 1956). Accord *Application of Lincoln Elec. System,* 207 Neb. 289, 298 N.W.2d 366 (1980). We have found no direction in the Siting Act or its legislative history giving the PSC the authority to determine if a need has been shown.[2] The North Dakota Legislature has demonstrated that, when it desires to do so, it can mandate that an administrative agency consider the issue of need. See § 49–03.1–04, NDCC ("need for the service" to be considered by the PSC before granting a certificate of public convenience and necessity); § 6–02–06(1), ND CC (state banking board must diligently inquire if the place where the proposed banking facility is to be located "is in need of further banking facilities").

Other state legislatures have clearly stated their requirement that a transmission facility must be "needed" before they allow construction to begin. In South Dakota, before approving a transmission line, the state legislature must find that a "proposed trans-state transmission facility will be consistent with the public convenience and necessity in any area or areas which will receive electrical service . . . from the facility, regardless of the state or states in which area or areas are located." Section 49–41B–4.2, S.D.Comp. Laws Ann. In Minnesota a certificate of need must be obtained

before work may be commenced on any large transmission line within the state. Section 116H.13(2), Minn.Stat.Ann. Nine factors are listed that are to be considered when the Minnesota Energy Commissioner assesses need. Section 116H.13(3), Minn. Stat.Ann. These statutes, unlike North Dakota's, disclose legislative attempts to evaluate energy needs.

The landowners also contend they were not afforded a fair hearing because the PSC suppressed their evidence on the question of need. The PSC considered every other legal issue raised, even though the landowners did not agree with the results. Because we have concluded the PSC does not have the authority or duty to determine need, it acted properly by controlling the proceedings to suppress such evidence. See *Williams Electric, supra,* 79 N.W.2d at 526. Accord *Siegel v. Atomic Energy Commission,* 400 F.2d 778, 783–84 (D.C.Cir.1968) (Atomic Energy Commission did not exceed the scope of its authority by excluding inquiry into dangers from enemy action and sabotage during consideration of application to construct energy-producing nuclear reactor).

The order of the PSC and the judgment of the district court is, in all aspects, affirmed.

ERICKSTAD, C.J., NORBERT J. MUGGLI, Surrogate Judge, and VANDE WALLE and SAND, JJ., concur.

Muggli, Surrogate Judge, sitting in place of Paulson, J., disqualified.

VANDE WALLE, Justice, concurring specially.

I agree with the conclusions reached by the majority opinion. The matter of need

---

**2.** The parties also argued, assuming the PSC had the authority to determine need, whether or not the exercise of such authority would constitute an undue burden on interstate commerce in violation of the United States Constitution. Because of our interpretation of the Siting Act, it is not necessary to reach this constitutional issue.

At the oral argument we were told that the PSC had approved a specific route for the

MANDAN line. Presumably NPPD will need to use the power of eminent domain to acquire right of way for the transmission line. Although the PSC does not have the authority under the Siting Act to determine "need," the courts have the authority to determine whether or not the taking of private property involved a "public use" when the issue is brought before them. See *Square Butte Elec. Coop. v. Hilken,* 244 N.W.2d 519 (N.D.1976).

appears to be the overriding issue with which the landowners are concerned. Although I agree with the majority opinion that our statutes do not evidence a clear legislative intent that the PSC consider need in issuing a certificate of corridor compatibility, it appears that under the statutory scheme set forth in Chapter 49–22, N.D.C.C., no determination of need by any public body, even a public body in the State or nation to be served by the transmission line, is required before the PSC and the landowners of this State are required to go through the time and effort to establish a corridor for the transmission line. Apparently any applicant may initiate the process without an official determination of need having been made. Thus in this instance it was only shortly before oral arguments were heard in this court—long after the initial application for a corridor had been filed, hearings had been held by the PSC, and an appeal taken to district court from the decision of the PSC—that the Nebraska Public Service Commission determined the transmission line was needed to provide electrical service in that State. We have not been informed whether or not the province of Manitoba has made that determination.

Although I agree that our present statutory scheme does not require the PSC to look into the issue of need, I also understand the concern of the landowners that some public agency, if only in the jurisdiction to be served by the transmission line, should be required to make that determination prior to the full implementation in this State of the procedures necessary to establish a corridor for the transmission line. Improbable though it may be, it appears that under our statutory scheme if our PSC has issued the required certificates an applicant could begin to acquire easements, through the eminent-domain process if necessary, before the need for the line had ever been officially determined. Perhaps if the need for the line in the jurisdiction to be served by it had been officially determined prior to the hearings before the PSC, the issue of whether or not the North Dakota PSC should consider need would not have been so sensitive.