CASS COUNTY ELECTRIC COOPERATIVE, INC., Appellee,

v.

NORTHERN STATES POWER COMPANY,

and

North Dakota Public Service Commission.

Civ. No. 870163.

Supreme Court of North Dakota.

Feb. 1, 1988.

---

Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, for appellee; argued by John D. Kelly. Appearance by Douglas R. Herman.

Wheeler, Wolf, Peterson, Schmitz, McDonald & Johnson, Bismarck, and David Lawrence, Legal Div., Northern States Power Co., Minneapolis, Minn., for appellant; argued by Ronald W. Wheeler, Bismarck. Appearance by David Lawrence, Minneapolis.

Lynn Lee Schloesser, Public Service Com'n, Bismarck, for North Dakota Public Service Com'n. No appearance.

ERICKSTAD, Chief Justice.

This case involves a territorial dispute between Cass County Electric Cooperative, Inc. [Cass], a rural electric cooperative, and Northern States Power Company [NSP], an electric public utility, over an area known as the South Pointe 1st Addition [South Pointe] within the city of Fargo. NSP appeals from a district court judgment which reversed a decision of the Public Service Commission [PSC] and remanded for further proceedings concerning Cass's request for injunctive relief under the provisions of the Territorial Integrity Act, Chapter 49–03, N.D.C.C. We affirm the judgment of the district court.

Cass provides electric service in Cass County, as well as seven other counties in the state. NSP provides electric and natural gas service in North Dakota and elsewhere. NSP has been authorized by the PSC, and has had a franchise, to provide electric service as an electric utility in the city of Fargo for more than 50 years.

For many years prior to 1975, Cass and NSP were parties to a "territorial agreement" which was designed to avoid "wasteful duplication" of electric facilities and covered areas in and around the cities of West Fargo and Fargo. One of the areas covered by the agreement and designated to be served by Cass was Barnes Township, where South Pointe is located. This agreement, however, was abandoned by the parties in 1975, and on October 28, 1975, Cass and the city of Fargo entered into an agreement giving Cass a nonexclusive right-of-way for its facilities in areas served by Cass and subsequently annexed by the city. Under the terms of this agreement, any area served by Cass which was annexed to the city would remain Cass's service area absent an objection by the city or another electric supplier.

In 1978 the city annexed a large area served by Cass south of 32nd Avenue South and west of U.S. Highway 81. The area now known as South Pointe is part of this annexed territory. No objections were lodged to Cass's claim to serve existing and new customers within the annexed area, and, prior to October 1986, Cass was the only supplier of electricity in the annexed territory. Cass included the annexed area in its long-range plans and has made large investments in facilities to serve that area. However, Cass has not provided service to an actual customer in the specific area now designated as South Pointe since 1981.

During August 1986, the developer of South Pointe conferred with officials of NSP and Cass concerning electric service for the new subdivision, which consists of one large commercial lot and 90 residential lots. The developer chose to request electric service as well as natural gas service from NSP, and the developer and NSP signed an agreement to that effect on August 28, 1986. At this time, the area platted as South Pointe was vacant. Both Cass and NSP serve electric account customers on property adjoining the new subdivision.

Cass filed a complaint with the PSC alleging that NSP's extension of its electric lines and system into South Pointe would "unreasonably interfere with Cass Electric's services, facilities and system and will result in a wasteful and unreasonable duplication" of its "investment in plant facilities and services." Cass sought an order restraining and enjoining NSP from constructing and extending its electric

lines, system, and facilities into South Pointe.

In the administrative proceedings, Cass asserted that although it has no customers which it presently serves in South Pointe, NSP's extension into the subdivision interferes with the economic viability of the electric system Cass has developed to serve the larger annexed area, and that this interference constitutes a violation of §§ 49–03–01 and 49–03–01.4, N.D.C.C. The PSC concluded that its authority to act under these circumstances was limited by § 49–03–01.3, N.D.C.C., which provides in pertinent part:

"*49–03–01.3. Exclusions from limitations on electric distribution lines, extension and service and on issuance of certificates of public convenience and necessity.* Sections 49–03–01 through 49–03–01.5, shall not be construed to require any such electric public utility to secure such order or certificate for an extension of its electric distribution lines within the corporate limits of any municipality within which it has lawfully commenced operations; provided, however, that such extension or extensions shall not interfere with existing services provided by a rural electric cooperative or another electric public utility within such municipality; and provided duplication of services is not deemed unreasonable by the commission."

Because Cass was not presently providing any electric service to customers within the subdivision, the PSC determined that under the provisions of § 49–03–01.3, NSP's extension of its electric distribution facilities did not "interfere with existing electric service of Cass ... nor unreasonably duplicate services within South Pointe." Consequently, the PSC dismissed Cass's complaint.

The district court reversed and remanded the case to the PSC for further consideration, concluding that the PSC's interpretation of § 49–03–01.3 was "too restrictive:"

"The commission in this case read the language which refers to existing services as only meaning those identifiable sites which are already being served at the time that incorporation is completed by a municipality. I am of the opinion that this is too restrictive of a reading. If that were true, the last line in the paragraph would be unnecessary in its reference to duplication of services. It is my belief that the commission must look at the availability of services in the area annexed and determine whether extension of NSP lines would be unnecessarily duplicating the services provided by Cass. If so, the injunction requested by Cass County should be granted since they have the right to serve in the general area involved in this proceeding. If not, and the commission determines that it is in the best interest of the general public, and the public convenience and necessity requires it, then the extension of NSP's line should be allowed and the injunction denied. However, this does require the commission to exercise its discretion in the interpretation of the statute and this case should not be handled as if it were a matter of law. The statute must be read more liberally than the reading presently given it by the PSC."

NSP has appealed from the district court's judgment.

The issue in this case is whether the PSC properly interpreted the provisions of the Territorial Integrity Act, Chapter 49–03, N.D.C.C., in determining in essence that it had no authority to act under the circumstances. This issue presents a question of law and, consequently, the PSC's determination on the matter is fully reviewable by this court. *Minnesota Mining and Manufacturing Co. v. Conrad,* 418 N.W.2d 276, 279 (N.D.1987).

■ The Territorial Integrity Act was enacted by the Legislature in 1965. *See* 1965 N.D.Sess.Laws Ch. 319. It amended §§ 49–03–01 and 49–03–05, N.D.C.C., which required a public utility, before beginning construction or operation of a public utility plant or system, or an extension thereof, to obtain from the PSC a certificate of public convenience and necessity. *See Montana-Dakota Utilities Co. v. Johanneson,* 153 N.W.2d 414, 418 (N.D.1967). The primary

purpose of the Act was to keep to a minimum wasteful duplication of capital-intensive utility services and conflicts between suppliers of electricity. *See Cass Cty. Elec. Coop., Inc. v. Wold Properties, Inc.,* 249 N.W.2d 514, 520–521 (N.D.1976). The cases decided under this Act have thus far generally involved situations where an electric public utility seeks to serve customers in rural areas outside the corporate limits of a municipality. *E.g., Tri–County Electric Cooperative, Inc. v. Elkin,* 224 N.W. 2d 785, 787 (N.D.1974). As the PSC noted in its order, the present case "is the first time a cooperative in North Dakota has attempted to prevent a utility extension within a municipality on the grounds that the extension interferes with the economic viability of the cooperative's system."

■ NSP initially asserts that Cass is prohibited from providing electric service in South Pointe after its annexation by the city because under § 10–13–04, N.D.C.C., no resident of the city of Fargo is eligible for membership in a rural electric cooperative. Section 10–13–04 provides in pertinent part:

"*10–13–04. Members of electric cooperatives.* All persons who are not receiving central station service and who reside in rural areas proposed to be served by a cooperative organized under this chapter, shall be eligible to membership in the cooperative. No person other than the incorporators shall be, become, or remain a member of a cooperative unless such person shall use or agree to use electrical energy or the facilities, supplies, equipment, and services furnished by a cooperative.

" 'Rural area' means any area not included within the boundaries of an incorporated city having a population in excess of twenty-five hundred inhabitants at the time a corporation or cooperative commences to operate electric facilities or to furnish electric energy in such an area, and includes both the farm and nonfarm population thereof. No change thereafter in the population of a rural area, as defined herein, regardless of the reason for such change, shall operate to

affect in any way its status as a rural area for the purposes of this chapter and of chapter 57–33."

NSP contends that a "rural area" loses its status as such under the statute once it is annexed by a municipality. NSP asserts that the language "[n]o change thereafter in the population of a rural area, ... regardless of the reason for such change, shall operate to affect in any way its status as a rural area ..." was only intended to mean that a city with fewer than 2,500 inhabitants that is served by an electric cooperative shall remain a "rural area" even if the population subsequently exceeds the statutory limit. We reject NSP's narrow interpretation of the statute.

Section 49–03–01.3, N.D.C.C., implicitly recognizes that a rural electric cooperative may lawfully provide electric services within a municipality which is served by an electric public utility. We are required to construe together all statutes relating to the same subject matter so as to harmonize them, if possible, and give full force and effect to the legislative intent. *Dickinson Public School Dist. No. 1 v. Scott,* 252 N.W.2d 216, 219 (N.D.1977). We believe it is possible to harmonize these provisions. NSP's assertion is premised on the theory that the language "[n]o change thereafter in the population of a rural area, ... regardless of the reason for such change ..." is not comprehensive enough to include a municipality's act of annexation because the population of a "rural area" is not actually changed through annexation. However, annexation is defined in its purist sense as the uniting of one thing to another. *See* Black's Law Dictionary 81 (5th ed. 1979). Thus, when a "rural area" is annexed by a municipality, its population in effect "changes" because it has become united with that of the municipality of which it is now a part. In view of § 49–03–01.3, which specifically contemplates the possibility of continued electric service by a cooperative within an annexed area, we conclude that § 10–13–04 does not prohibit Cass from providing electric service in South Pointe.

Cass relied upon §§ 49–03–01 and 49–03–01.4, N.D.C.C., in seeking to enjoin NSP from extending its facilities into South Pointe. Those statutes provide in pertinent part:

*"49–03–01. Certificate of public convenience and necessity—Secured by electric public utility.*—No electric public utility henceforth shall begin construction or operation of a public utility plant or system, or of an extension of a plant or system, except as provided below, without first obtaining from the commission a certificate that public convenience and necessity require or will require such construction and operation. This section does not require an electric public utility to secure a certificate for an extension within any municipality within which it has lawfully commenced operations. If any electric public utility in constructing or extending its line, plant, or system, unreasonably interferes with or is about to interfere unreasonably with the service or system of any other electric public utility, or any electric cooperative corporation, the commission, on complaint of the electric public utility or the electric cooperative corporation claiming to be injuriously affected, after notice and hearing as provided in this title, may order enforcement of this section with respect to the offending electric public utility and prescribe just and reasonable terms and conditions."

*"49–03–01.4. Enforcement of act.*—If any electric public utility violates or threatens to violate any of the provisions of sections 49–03–01 through 49–03–01.5 or interferes with or threatens to interfere with the service or system of any other electric public utility or rural electric cooperative, the commission, after complaint, notice, and hearing as provided in chapter 28–32, shall make its order restraining and enjoining said electric public utility from constructing or extending its interfering lines, plant or system. In addition to the restraint imposed, the commission shall prescribe such terms and conditions as it shall deem reasonable and proper."

■ Cass asserts that the PSC was obligated to enjoin NSP's actions under §§ 49–03–01 and 49–03–01.4, regardless of the provisions of § 49–03–01.3. We disagree. In the construction and interpretation of statutes, a special or more specific provision must prevail over general provisions relating to the same subject matter, absent a manifestation of legislative intent to the contrary. *Mid–America Real Estate & Inv. Corp. v. Lund,* 353 N.W.2d 286, 289–290 (N.D.1984). While §§ 49–03–01 and 49–03–01.4 address interference with the service or system of another electric supplier in general, § 49–03–01.3 specifically addresses the interference prohibited when a public utility extends its lines within a municipality. Moreover, if we were to accept Cass's argument, the provisions of § 49–03–01.3 would be rendered meaningless. We conclude that the PSC correctly determined that § 49–03–01.3 is applicable in this case.

■ The PSC's conclusion that § 49–03–01.3 provided it with the authority to act only if NSP's extension interfered with services provided to actual customers of Cass within South Pointe is premised on two bases. First, the PSC relied upon the following statement of this court in *Tri-County Electric Cooperative, Inc. v. Elkin,* 224 N.W.2d 785, 794 (N.D.1974):

"Even if it should be true that the area in question will eventually be annexed to the city of Jamestown, that eventuality has been provided for by law insofar as the orderly continuance or transfer of electric service systems is concerned. The cooperative could continue to serve its customers until such time as its property in the annexed area is acquired by the franchised utility by negotiation or eminent domain. *Montana–Dakota Utilities Co. v. Divide County School District No. 1,* 193 N.W.2d 723 (N.D. 1972). Or the City could give the cooperative a franchise to continue to serve the customers it is serving."

The PSC concluded that "[t]his dicta suggests the Court contemplated the possibility of continued service by a cooperative to *existing* customers subsequent to annexa-

tion. There is no indication the Court believed the annexed area could remain the exclusive service area of the cooperative." [Emphasis in original.]

We initially note, as did the PSC, that the above-quoted statement in *Tri–County Electric* is dictum. Under the facts in *Tri–County Electric, supra,* 224 N.W.2d at 788, the public utility held "the only franchise to supply electricity within the city limits of Jamestown." The court was not confronted with a situation where an agreement between the cooperative and the city allowed the cooperative to serve new customers after annexation, as in this case. In any event, dictum is not controlling in subsequent cases. *Bakke v. St. Thomas Public School Dist. No. 43,* 359 N.W.2d 117, 120 (N.D.1984). We do not find *Tri–County Electric* persuasive authority for the proposition that cooperatives are statutorily precluded from serving new customers within an annexed area.

■ Second, the PSC relied upon an amendment to § 49–03–01.3 before its passage by the Legislature in 1965. When originally introduced as a part of House Bill 724, the first paragraph of § 49–03–01.3 provided:

"SECTION 4. EXCLUSIONS FROM LIMITATIONS ON ELECTRIC DISTRIBUTION LINES, EXTENSION AND SERVICE AND ON ISSUANCE OF CERTIFICATES OF PUBLIC CONVENIENCE AND NECESSITY. This Act shall not be construed to require any such electric public utility to secure such order or certificate for an extension of its electric distribution lines within the corporate limits of any municipality within which it has lawfully commenced operations; provided, however, that such extension or extensions shall not interfere with existing *or available* services provided by a rural electric co-operative or another electric public utility within such municipality; and...." [Emphasis added.]

Before passage, the bill was amended by deleting the words "or available" and inserting as the final sentence of the paragraph, "provided duplication of services is not deemed unreasonable by the public service commission." The PSC reasoned that this amendment resulted in the Legislature's adoption of "a narrower definition of interference than that urged by Cass...."

We reject the PSC's conclusion regarding the effect of the bill's amendment. Although "available services" was deleted from the provision, the final sentence, "provided duplication of services is not deemed unreasonable by the public service commission," was also added. If the statute were interpreted to prohibit only interference with actual service to existing customers, the last sentence of the first paragraph of § 49–03–01.3 could only be ascribed a meaning which is wholly at odds with the paramount purpose of the Territorial Integrity Act. While this court has in the past declined to say whether rural electric cooperatives or public utilities were given special preference as suppliers of electricity under the Act, we have recognized that keeping to a minimum wasteful duplication of capital-intensive utility services is one of its primary goals. *See Wold Properties, Inc., supra,* 249 N.W.2d at 520–521. Under the PSC's analysis, it would have no authority to act, regardless of the amount of duplication in investments and electric facilities in an annexed area, unless NSP attempted to serve a customer already being served by Cass, and under that rationale, NSP could extend its services to areas as small as city lots without creating an unreasonable duplication of services under the statute. We do not believe this was intended by the Legislature when it enacted the Territorial Integrity Act.

We agree with the district court that the PSC interpreted the statute too narrowly. The PSC must look at the existing electric facilities that Cass and NSP have in place in the area and determine whether extension of NSP's services in South Pointe would constitute an unreasonable duplication of capital-intensive facilities and services already provided by Cass.

NSP argues that even if its utility extension interferes with existing cooperative service or unreasonably duplicates cooperative facilities, the extension can be ap-

proved by the PSC because the proviso in § 49–03–01.3 must be interpreted as a limitation only upon the public utility's right to extend within a municipality without a certificate of public convenience and necessity. The proviso, NSP contends, cannot be enlarged to constitute a prohibition. We disagree.

It is generally true, as asserted by NSP, that the purpose of a proviso in a statute is to modify the enacting clause and not to enlarge it or to confer a power. But the use of the word "provided" does not in and of itself convert the words following into a "proviso;" the word may also be used in a conjunctive sense. *See Bowers v. Missouri Mut. Ass'n*, 333 Mo. 492, 62 S.W. 2d 1058, 1063 (1933); *McKenna v. Roberts County*, 72 S.D. 250, 32 N.W.2d 687, 689 (1948). Thus, the general principle "is not unbending and if a consideration of all statutes bearing upon the subject indicates a different Legislative intent, this will prevail over a construction based upon the rules of syntax." *Kinney Loan & Finance Co. v. Sumner*, 159 Neb. 57, 65 N.W.2d 240, 248 (1954). *See also* 2A Sutherland Stat.Const. § 47.08 (4th ed. 1984).

As noted earlier, wasteful duplication of investment, facilities, and service is what the Territorial Integrity Act was intended to minimize. *See Wold Properties, Inc., supra*, 249 N.W.2d at 521. This consideration is also a primary factor in determining whether a certificate of public convenience and necessity should issue. *See Tri–County Electric, supra*, 224 N.W.2d at 792–793. We do not believe the Legislature intended the anomalous consequence of allowing the PSC to grant a certificate of public convenience and necessity for an extension of service after the PSC has already determined that such an extension not only interferes with the existing services and facilities of a cooperative but also constitutes an "unreasonable" duplication of such services and facilities.[1]

Accordingly, we affirm the judgment of the district court and remand this case to the PSC for a determination of whether or not NSP's extension interferes with and would constitute an unreasonable duplication of investment and available facilities and services provided by Cass. If so, the injunction requested by Cass should be granted. If not, NSP's extension should be allowed and Cass's request for an injunction denied.

VANDE WALLE, GIERKE and MESCHKE, JJ., concur.

VERNON R. PEDERSON, Surrogate Justice, sitting in place of LEVINE, J., disqualified.

VERNON R. PEDERSON, Surrogate Justice, concurring specially.

I concur in the result which Chief Justice Erickstad has reached, however, I would have couched the opinion in different terms so as to make certain that it would not be misunderstood with respect to the scope of review in the supreme court of administrative determinations that have already been reviewed by a district court either under the Administrative Agencies Practice Act (Ch. 28–32, NDCC) or otherwise.

Recently this court, in *Otto v. Job Service North Dakota*, 390 N.W.2d 550, 551 (N.D.1986), said that on appeals from administrative determinations:

> include: the location of the lines of the suppliers; the reliability of the service which will be rendered by them; which of the proposed suppliers will be able to serve the area more economically and still earn an adequate return on its investment; and which supplier is best qualified to furnish electric service to the site designated in the application and which also can best develop electric service in the area in which such site is located without wasteful duplication of investment or service.' 169 N.W.2d 415, at 418."

---

1. We do not imply that the factors for consideration of whether or not a certificate of public convenience and necessity should be granted are irrelevant to the PSC's determination of an unreasonable duplication of services under § 49–03–01.3, N.D.C.C. Those criteria are set forth in *Tri–County Electric Cooperative, Inc. v. Elkin*, 224 N.W.2d 785, 791 (N.D.1974):

   "[I]n *Application of Otter Tail Power Co.*, 169 N.W.2d 415 (N.D.1969), ... it was stated that 'customer preference should be considered' and

   " 'there are a number of other factors which also must be considered ... These factors

"We review the decision of the agency rather than the decision of the district court ..."

Similar statements are found in: *Perske v. Job Service North Dakota,* 336 N.W.2d 146 (N.D.1983); *Application of Nebraska Public Power Dist,* 330 N.W.2d 143, 146 (N.D.1983); *Lee v. Gulf Oil Exploration and Production,* 318 N.W.2d 766, 768 (N.D.1982); *Barnes County v. Garrison Diversion, Etc.,* 312 N.W.2d 20, 25 (N.D. 1981); and *Shaw v. Burleigh County,* 286 N.W.2d 792, 797 (N.D.1979). See also *Geo. E. Haggart, Inc. v. North Dakota Work. Comp. Bur.,* 171 N.W.2d 104 (N.D.1969).