2007 ND 128

CAPITAL ELECTRIC COOP-
ERATIVE, INC., Plain-
tiff and Appellant

v.

CITY OF BISMARCK, North Dakota,
Defendant and Appellee

and

Montana–Dakota Utilities, Inc., a Divi-
sion of MDU Resources Group, Inc.,
Defendant, Counterclaimant, and Ap-
pellee

and

The Public Service Commission of
North Dakota, Defendant

Montana–Dakota Utilities Company,
a Division of MDU Resources
Group, Inc., Appellant

v.

The Public Service Commission of
North Dakota and Capital Elec-
tric Cooperative, Inc., Appellees.

Nos. 20060199, 20060270.

Supreme Court of North Dakota.

July 27, 2007.

Rehearing Denied Aug. 27, 2007.

Carol K. Larson (argued), Pringle & Herigstad, Minot, N.D., for Capital Electric Cooperative, Inc., The Public Service Commission of North Dakota and Capital Electric Cooperative, Inc.

Randall J. Bakke (argued) and Mitchell D. Armstrong (on brief), Smith Bakke

Porsborg & Schweigert, Bismarck, N.D., for City of Bismarck, North Dakota.

Daniel S. Kuntz (argued), MDU Resources Group, Inc., Bismarck, N.D., Jerome C. Kettleson (appeared) and Patrick W. Durick (on brief), Pearce & Durick, Bismarck, N.D., for Montana–Dakota Utilities, Inc., a Division of MDU Resources Group, Inc., Montana–Dakota Utilities Company, a Division of MDU Resources Group, Inc.

William W. Binek (argued), Special Assistant Attorney General, Public Service Commission, State Capitol, Bismarck, N.D., for appellee Public Service Commission of North Dakota.

SANDSTROM, Justice.

[¶ 1] Capital Electric Cooperative and Montana–Dakota Utilities Company ("MDU") both contend they are entitled to provide electric service to certain customers within the City of Bismarck. Capital Electric appeals from a judgment that "denied" its appeal from a Bismarck City Commission decision construing Bismarck's electric distribution franchises with Capital Electric and with MDU to allow MDU, and not Capital Electric, to provide electric service to new customers in the Boulder Ridge First Addition in northwest Bismarck. MDU appeals from a judgment affirming a Public Service Commission ("PSC") decision ordering MDU not to provide electric service to Boulder Ridge. We conclude each utility's franchise authorizes it to provide electric service to Boulder Ridge, and, therefore, the PSC's decision controls the distribution of electric service in Boulder Ridge. We reverse the judgment in Capital Electric's appeal and affirm the judgment in MDU's appeal.

I

[¶ 2] In 1987, Bismarck, a home rule city with an ordinance requiring electric service providers to have a franchise to provide service within the city, adopted a resolution renewing a twenty-year "non-exclusive" franchise for MDU to operate an electric distribution system in Bismarck as "now, or hereafter constituted." MDU's franchise did not include any geographic limitations.

[¶ 3] In 1973 and again in 1993, Bismarck also granted Capital Electric a twenty-year "non-exclusive" franchise to operate an electric distribution system in Bismarck as "now, or hereafter constituted." Capital Electric's franchise included a geographic limitation that provided:

1. In order to avoid a duplication of facilities between [Capital Electric] and other electrical franchises, the authority granted Capital Electric under this franchise is limited geographically to the areas within the city described in the Area Service Agreement dated July 5, 1973 executed by Capital Electric Cooperative, Inc., and Montana–Dakota Utilities Co., as modified by Amendment dated October 25, 1990, and any future amendments to the Area Service Agreement agreed to by [Capital Electric] and Montana–Dakota Utilities. [Capital Electric] shall enjoy all of the privileges and rights described in the Area Service Agreement. If the Area Service Agreement and Amendments thereto are canceled by either electric supplier during the term of this franchise, all privileges, rights, obligations and restrictions as therein stated shall continue to apply to both Capital Electric Cooperative, Inc., and Montana–Dakota Utilities Co.

[¶ 4] In 1973, Capital Electric and MDU executed an area service agreement that included an attached map outlining each company's respective service areas and provided MDU would continue to serve the area encompassing the city of Bismarck and new areas contiguous to Bismarck and Capital Electric would continue to serve rural areas not receiving central station service and other areas identified in the area service agreement. The area service agreement further provided:

4.   It is agreed that the interests of the consumer can best be met by providing that [MDU] serve those consumers within the area bounded by the heavy dashed black line on the attached map, which shall be made a part of this agreement, as well as any new consumers who come into that area and that [Capital Electric] will continue to serve its present consumers within the heavy dashed black line and will serve new consumers within the heavy dashed black line only under conditions further stipulated in this agreement. The principal service area of [Capital Electric] will be that area which lies outside the heavy dashed black line. The agreement shall apply only to area described by the map.

5.   In the event there is need for either party to this agreement to serve a prospective consumer located in the area served by the other party, such service shall be supplied only with the written consent of the other party, provided that such individual exception shall not in any way alter the basic intentions of the parties, that each shall serve or offer service to the new consumers within their respective service areas.

. . . .

8.   It is mutually agreed by both parties that each will continue to serve customers it now has within the boundaries of the other party as stipulated and identi-fied in the agreement. Such customer identification shall be from the books and records of each of the parties as of date of signing of this agreement. If an exchange of customers can be agreed upon by both parties and to the satisfaction of the consumer or consumers, such an exchange can be made.

9.   This agreement will in no way affect [MDU's] or [Capital Electric's] needs or plans to construct transmission line facilities for the purpose of providing adequate electric power for the consumers in the area it serves.

10.   This agreement is subject to approval, order, and other actions of the Public Service Commission of North Dakota or any other governmental agencies or bodies having jurisdiction over transactions and service herein covered.

11.   It is realized that the foregoing instrument will not cover all conditions which may arise, but if followed in good faith by both parties, will serve as a guide to future developments and growth for both organizations, thus it is mutually agreed that this agreement will be reviewed at least once every five years for the purpose of evaluating its operation and to discuss possible modifications which may be desirable to more efficiently carry out the intent of both parties.

The area service agreement was subject to cancellation "by either party by giving twelve month's written notice to the other party of such cancellation." By letter dated June 26, 2002, MDU provided Capital Electric with "12 months written notice . . . of Agreement cancellation for all areas covered by the Agreement outside the city limits of Bismarck and thereby not covered by Capital Electric's limited electric franchise from the City of Bismarck."

[¶ 5] In April 2005, the Boulder Ridge First Addition was annexed to Bismarck.

Boulder Ridge is a subdivision in northwest Bismarck in section 16 of Township 139 North, Range 80 West, Haycreek Township. Capital Electric provides electric service in the rural areas outside and urban areas inside and outside Bismarck and had provided electric service to at least some customers in Boulder Ridge before the annexation. The Boulder Ridge area is "outside the heavy dashed black line" on the map attached to the area service agreement and was located in the "principal service area" of Capital Electric under the language of that agreement. Both MDU and Capital Electric sought to provide electric service to new customers in Boulder Ridge.

[¶ 6] In August 2005, MDU petitioned the Bismarck City Commission for a declaration of MDU's franchise rights to provide electric service to Boulder Ridge. After a hearing before the Bismarck City Commission and a subsequent special meeting, the Commission issued November 2005 findings of fact and conclusions of law on MDU's petition. The Commission concluded it was authorized to "decide questions regarding the franchises issued by it." The Commission said MDU and Capital Electric had offered differing opinions regarding the meaning of the franchises and the area service agreement and decided the area service agreement was ambiguous. The Commission considered extrinsic evidence from the early 1960s to indicate the parties' intent to allow Capital Electric a limited presence in the city, with MDU being the primary electric supplier. The Commission interpreted the area service agreement and related provisions of Capital Electric's franchise to mean:

> The intention of the parties in the Area Service Agreement and by extension, the intention of the City when it awarded a franchise to [Capital Electric], was for MDU to remain the main provider of electric services within the City, except

for [Capital Electric's] existing customers and any other customers or service areas conceded to [Capital Electric] by MDU. It was not the intention of the parties or of the City, that the map attached to the Area Service Agreement would be in place for 40 years without amendment but rather that it would be amended as the City grew to allow for healthy efficient growth for both utilities. It was not the intent of the City that [Capital Electric] would become the exclusive electric power supplier for all new areas of the City outside the line shown in the Area Service Agreement. It was the City's intent, in including the Area Service Agreement in the [Capital Electric] Franchise, that the line on the Area Service Agreement map would move outward as the City grew.

. . . .

[Capital Electric's] Franchise is limited to those areas within the City that are described in the Area Service Agreement or any amendments thereto. The areas "within the City" described in the Area Service Agreement are as shown on the Area Service Agreement map outside the bold line and within the City. The "areas within the City" would also include any areas later annexed to the City that were named by an amendment to the Area Service Agreement. Customers of [Capital Electric] within the City in 1973 and any other customers specifically consented to by MDU would also be included under the express terms of the Area Service Agreement. [Capital Electric's] Franchise does not grant the authority to serve all new areas of the City that are outside the bold line on the map without amendment to the Area Service Agreement. The ability of the parties to execute new amendments ended on June 26, 2003,

the effective date of cancellation of the Area Service Agreement by MDU.

The Bismarck City Commission decided MDU was entitled to provide electric service to Boulder Ridge, subject to Capital Electric's right to retain any existing customers in that area.

[¶ 7] In November 2005, Capital Electric brought a declaratory judgment action against Bismarck, MDU, and the PSC, seeking a declaration of Capital Electric's rights under its franchise with Bismarck. The district court decided declaratory relief was not an available remedy to challenge Capital Electric's claim that Bismarck's decision was wrong. The court treated Capital Electric's declaratory judgment action as an appeal, and in a March 2006 decision, the court concluded that Bismarck's interpretation of the franchises to allow MDU to provide electric service in Boulder Ridge, subject to Capital Electric's right to retain any existing customers in the area, was not arbitrary, capricious, or unreasonable. A June 2006 judgment dismissed Capital Electric's declaratory judgment action and "denied" Capital Electric's appeal.

[¶ 8] Meanwhile, in September 2005, Capital Electric filed a complaint against MDU with the PSC under N.D.C.C. § 49–03–01.3 of the Territorial Integrity Act, seeking to enjoin MDU from providing electric service to Boulder Ridge. After an administrative hearing, the PSC, in a June 2006 split decision, found MDU's extension of its facilities into Boulder Ridge interfered with and constituted an unreasonable duplication of Capital Electric's available facilities and services in Boulder Ridge. The PSC ordered MDU to stop providing and extending its electric service to Boulder Ridge and required MDU to sell its Boulder Ridge electric distribution facilities to Capital Electric. In October 2006, the district court affirmed the PSC

decision. We stayed the October 2006 judgment affirming the PSC decision, and we consolidated Capital Electric's appeal with MDU's appeal.

[¶ 9] The district court had jurisdiction to hear a declaratory judgment action under N.D. Const. art. VI, § 8, and N.D.C.C. §§ 27–05–06 and 32–23–01; to hear an appeal from a city commission decision under N.D. Const. art. VI, § 8, N.D.C.C. §§ 27–05–06 and 28–34–01, and *Tibert v. City of Minto*, 2006 ND 189, ¶ 6, 720 N.W.2d 921; and to hear an appeal from the PSC decision under N.D. Const. art. VI, § 8, and N.D.C.C. §§ 27–05–06 and 28–32–42. The appeals are timely under N.D.R.App.P. 4(a) and N.D.C.C. § 28–32–49. This Court has jurisdiction under N.D. Const. art. VI, §§ 2 and 6, and N.D.C.C. §§ 28–27–01 and 28–32–49.

II

[¶ 10] In Capital Electric's appeal from the judgment upholding the Bismarck City Commission decision, Capital Electric argues the district court erred in deciding an action for declaratory relief was not a remedy available to challenge Bismarck's decision, because N.D.C.C. § 32–23–02 authorizes a declaratory judgment action for the construction of a franchise. Capital Electric argues the district court erred in treating Capital Electric's declaratory judgment action as an appeal, because no statutes authorize an appeal from Bismarck's decision, and in the absence of a statute authorizing an appeal, declaratory relief is available to challenge Bismarck's interpretation of the franchises. Capital Electric argues its franchise authorizes it to provide electric service to areas within its principal service area, which is outside the heavy dashed black line on the map attached to the area service agreement, as those areas are annexed to Bismarck.

[¶ 11] Bismarck and MDU respond that Capital Electric is not seeking a declaration of rights before the rights have been violated as required by an action for declaratory relief, but is challenging Bismarck's interpretation of the franchises, and an appeal is authorized by N.D.C.C. § 27–05–06(4) and by N.D.C.C. ch. 28–34. Bismarck and MDU nevertheless argue Capital Electric was not prejudiced by the district court's consideration of the action as an appeal, because the court's analysis under the arbitrary, capricious, and unreasonable standard is the same whether the case is treated as an appeal or as a declaratory judgment action. They argue the heavy dashed black line on the map attached to the area service agreement was intended to move outward as new areas were annexed to Bismarck. They claim MDU has an exclusive right to provide electric service to Boulder Ridge and Bismarck's interpretation of the franchises to allow MDU to provide electric service to new customers in Boulder Ridge was not arbitrary, capricious, or unreasonable.

[¶ 12] Municipalities possess only those powers expressly granted by constitution or statute or necessarily implied from an express grant. *See Bigwood v. City of Wahpeton*, 1997 ND 124, ¶ 10, 565 N.W.2d 498; *Ebach v. Ralston*, 469 N.W.2d 801, 804 (N.D.1991); *Munch v. City of Mott*, 311 N.W.2d 17, 20 (N.D. 1981); *Roeders v. City of Washburn*, 298 N.W.2d 779, 782 (N.D.1980); *City of Fargo v. Cass County*, 286 N.W.2d 494, 500 (N.D. 1979); *City of Fargo v. Harwood Twp.*, 256 N.W.2d 694, 697 (N.D.1977). Under N.D. Const. art. VII, § 11, "[t]he power of the governing board of a city to franchise the construction and operation of any public utility or similar service within the city shall not be abridged by the legislative assembly." Section 40–05–01(57), N.D.C.C., authorizes the governing body of a municipality to "grant franchises ... to extend for a period of not to exceed twenty years, and to regulate the use of the same, franchises granted pursuant to the provisions of this title not to be exclusive or irrevocable but subject to the regulatory powers of the governing body." Section 40–05.1–06(10), N.D.C.C., also authorizes home rule cities "to grant and regulate franchises" for utilities.

[¶ 13] Bismarck has enacted an ordinance that requires electric suppliers to have a franchise from the city before providing electric service within the city. City of Bismarck, N.D., Code of Ordinances § 10–11–01. MDU has a non-exclusive franchise to provide electric service in Bismarck without any geographic limitations, and Capital Electric has a non-exclusive franchise to provide electric service in Bismarck with some geographic limitations. Under North Dakota law, Capital Electric must have a franchise to serve Boulder Ridge after that area was annexed to Bismarck. *See Montana–Dakota Utils. Co. v. Divide County Sch. Dist.*, 193 N.W.2d 723, 730–31 (N.D.1971) (holding right of electric cooperative without franchise to provide electric service to area outside city terminated when area became annexed to city that required franchise to provide service within city). If both MDU and Capital Electric have franchises to provide electric service to Boulder Ridge, the PSC has authority to decide whether either entity's extension of services in Boulder Ridge will unreasonably interfere with and duplicate services of the other under N.D.C.C. § 49–03–01.3 and this Court's decisions culminating in *Cass County Elec. Coop. v. N.S.P.*, 419 N.W.2d 181 (N.D.1988), and *N.S.P. v. P.S.C.*, 452 N.W.2d 340 (N.D.1990). In *Cass County Elec. Coop.*, 419 N.W.2d at 183, both a public utility and a rural electric cooperative were authorized by the City of Fargo

to serve the South Pointe area that had been annexed to Fargo. This Court decided the PSC must look at both entities' existing facilities in the entire surrounding area to determine whether the public utility's extension of services into South Pointe would constitute an unreasonable duplication of capital-intensive facilities and services already provided by the rural electric cooperative and remanded for further proceedings. *Id.* at 187. After remand, this Court held that a preponderance of evidence supported the PSC's decision that the public utility's extension of services into the South Pointe area was a duplication of the electric cooperative's facilities in the area. *N.S.P.*, 452 N.W.2d at 345.

[¶ 14] Under the foregoing legal principles, the central issue in this case involves the meaning of the geographic limitations in Capital Electric's franchise and whether that franchise effectively precludes Capital Electric from providing electric service to new customers in Boulder Ridge.

■■■ [¶ 15] A franchise is a contract. *Western Elec. Co. v. City of Jamestown*, 47 N.D. 157, 169–70, 181 N.W. 363, 367–68 (1921); 12 Eugene McQuillin, *The Law of Municipal Corporations* § 34:5 (3rd ed.2006); 36 Am.Jur.2d *Franchises from Public Entities* § 6 (2001). The interpretation of a written contract to determine its legal effect is a question of law for a court to decide, and on appeal, this Court will independently examine and interpret the contract to determine whether it has been erroneously construed. *See Peoples State Bank of Truman, Inc. v. Molstad Excavating, Inc.*, 2006 ND 183, ¶ 19, 721 N.W.2d 43; *City of Bismarck v. Mariner Constr., Inc.*, 2006 ND 108, ¶ 11, 714 N.W.2d 484; *Bernabucci v. Huber*, 2006 ND 71, ¶ 15, 712 N.W.2d 323; *Tri–State Ins. Co. v. Commercial Group West, LLC*, 2005 ND 114, ¶ 10, 698 N.W.2d 483.

[¶ 16] Except as otherwise provided by law, public and private contracts are interpreted by the same rules of interpretation. N.D.C.C. § 9–07–01. A contract's language governs its interpretation if the language is clear and explicit and does not involve an absurdity. N.D.C.C. § 9–07–02. The object of interpreting and construing a contract is to ascertain and give effect to the parties' mutual intention at the time of contracting. N.D.C.C. § 9–07–03. The parties' intention must be ascertained from the writing alone, if possible. N.D.C.C. § 9–07–04. A contract must be construed as a whole to give effect to each provision, if reasonably possible. N.D.C.C. § 9–07–06. Several contracts relating to the same subject between the same parties and as part of one transaction are construed together. N.D.C.C. § 9–07–07. A contract must be interpreted to make it lawful, operative, definite, reasonable, and capable of being carried into effect. N.D.C.C. § 9–07–08. Words in a contract must be construed in their ordinary and popular sense. N.D.C.C. § 9–07–09. A contract may be explained by reference to the circumstances under which it was made and the matter to which it relates. N.D.C.C. § 9–07–12. Particular clauses of a contract are subordinate to its general intent. N.D.C.C. § 9–07–15. If a contract is uncertain, the language of the contract should be interpreted most strongly against the party who caused the uncertainty to exist; however, for contracts between a public entity and a private party, it is presumed that all uncertainty was caused by the private party. N.D.C.C. § 9–07–19; *See Mariner Constr., Inc.*, 2006 ND 108, ¶ 11, 714 N.W.2d 484.

■■■ [¶ 17] "If a written contract is unambiguous, extrinsic evidence is not admissible to contradict the written language." *Lire, Inc. v. Bob's Pizza Inn Rests., Inc.*, 541 N.W.2d 432, 434 (N.D.

1995). If a written contract is ambiguous, however, extrinsic evidence may be considered to show the parties' intent. *Id.* "Whether or not a contract is ambiguous is a question of law." *Id.* An ambiguity exists when rational arguments can be made in support of contrary provisions as to the meaning of the language in question. *Id.*

[¶ 18] Our rules of interpretation are consistent with the well-established general principle that franchises are construed against the grantee and in favor of the public. *See* 12 Eugene McQuillin, *The Law of Municipal Corporations,* at § 34:62; 36 Am.Jur.2d *Franchises from Public Entities,* at § 24; 37 C.J.S. *Franchises* § 19 (1997). Moreover, in *Western Elec. Co.,* 47 N.D. at 172–73, 181 N.W. at 369, this Court ruled that parties to an electric distribution franchise, by their acts and conduct, had adopted a practical construction of the franchise that controlled whether a city was required to pay an electric company for electricity furnished to the city for a room in the city hall. *See also Old Colony Trust Co. v. City of Omaha,* 230 U.S. 100, 118, 33 S.Ct. 967, 57 L.Ed. 1410 (1913) (parties' practical interpretation of franchise for any considerable period before controversy arises is of great, if not controlling, influence). *See generally* 36 Am.Jur.2d *Franchises from Public Entities,* at § 25.

[¶ 19] This Court has also recognized that although the enactment of a municipal ordinance is a legislative function, the interpretation of an ordinance by a municipality's governing body is a quasi-judicial act, and we have frequently recognized the authority of municipalities to interpret their ordinances. *See Bigwood,* 1997 ND 124, ¶ 10, 565 N.W.2d 498; *A & H Servs., Inc. v. City of Wahpeton,* 514 N.W.2d 855, 857–58 (N.D.1994); *Mini Mart, Inc. v. City of Minot,* 347 N.W.2d 131, 136 (N.D.

1984); *Munch,* 311 N.W.2d at 22. We also have said a court's review of a municipality's interpretation of an ordinance is limited by the doctrine of separation of powers, and courts will not substitute their judgment for that of the municipality's governing body in interpreting or applying ordinances unless the municipality's governing body acted arbitrarily, capriciously, or unreasonably. *GO Comm. ex rel. Hale v. City of Minot,* 2005 ND 136, ¶ 8, 701 N.W.2d 865 (citing *A & H Servs.,* 514 N.W.2d at 858). In *Hentz v. Elma Twp. Bd.,* 2007 ND 19, ¶ 4, 727 N.W.2d 276 (quoting *City of Fargo v. Ness,* 551 N.W.2d 790, 792 (N.D.1996)), we recently explained this Court will "fully review the interpretation of an ordinance, and a governing body's failure to correctly interpret and apply controlling law constitutes arbitrary, capricious, and unreasonable conduct."

[¶ 20] We have applied those standards in actions for a declaratory judgment, *see GO Comm. ex rel. Hale v. City of Minot,* 2005 ND 136, ¶¶ 1, 8, 701 N.W.2d 865; *Bigwood,* 1997 ND 124, ¶¶ 8–10, 565 N.W.2d 498; for injunctive relief, *see Ness,* 551 N.W.2d at 791–92; *A & H Servs.,* 514 N.W.2d at 856–58; *Munch,* 311 N.W.2d at 20–23; for mandamus, *see Mini Mart,* 347 N.W.2d at 133, 141–42; and in appeals from decisions by a municipality. *See Tibert,* 2006 ND 189, ¶ 8, 720 N.W.2d 921; *Pic v. City of Grafton,* 1998 ND 202, ¶ 11, 586 N.W.2d 159.

[¶ 21] Here, we need not decide whether the district court erred in dismissing Capital Electric's declaratory judgment action and treating that action as an appeal, because under either procedure we conclude Bismarck failed to correctly interpret and apply controlling law in construing Capital Electric's franchise, and therefore Bismarck's interpretation was arbitrary, capricious, and unreasonable.

[¶ 22]   The plain language of the franchises granted both Capital Electric and MDU "non-exclusive" franchises to provide electric service in Bismarck as "now, or hereafter constituted."   MDU's franchise was not limited geographically, but Capital Electric's franchise was "limited geographically to the areas within the city described in the Area Service Agreement dated July 5, 1973 ... as modified by Amendment dated October 25, 1990, and any future amendments."   Capital Electric's franchise provided that Capital Electric would "enjoy all of the privileges and rights described in the Area Service Agreement," and if that agreement was cancelled by either electric supplier during the term of Capital Electric's franchise, "all privileges, rights, obligations and restrictions as therein stated shall continue to apply to both" Capital Electric and MDU.   The area service agreement allowed MDU to "serve those consumers within the area bounded by the heavy dashed black line on the attached map, ... as well as any new consumers who come into that area" and allowed Capital Electric to "continue to serve its present consumers within the heavy dashed black line and serve new consumers within the heavy dashed black line only under conditions further stipulated" in that agreement.   The agreement further provided that Capital Electric's "principal service area ... will be that area which lies outside the heavy dashed black line," which includes Boulder Ridge. The area service agreement said Capital Electric and MDU "mutually agreed ... that each will continue to serve customers it now has within the boundaries of the other party," and:

> In the event there is need for either party to this agreement to serve a prospective consumer located in the area served by the other party, such service shall be supplied only with the written consent of the other party, provided that

such individual exception shall not in any way alter the basic intentions of the parties, that each shall serve or offer service to the new consumers within their respective service areas.

The parties recognized the agreement would not cover all conditions that may arise, but if followed in good faith by both parties, it would serve to guide future developments and growth for both organizations.   The parties agreed to review the agreement once every five years to evaluate its operation and discuss modifications to carry out the intent of both parties.

[¶ 23]   Bismarck interpreted the franchises to mean MDU would be the main provider of electric service within Bismarck except for Capital Electric's existing customers and the heavy dashed black line that generally separated the parties' respective service areas on the map attached to the area service agreement would move outward as Bismarck grew. Bismarck said it did not intend for Capital Electric to be the exclusive electric supplier for all new areas outside the heavy dashed black line on the map attached to the area service agreement.   Bismarck decided MDU was entitled to provide electric distribution service to Boulder Ridge, subject to Capital Electric's right to retain any existing customers in that area, concluding:

> [Capital Electric's] Franchise is limited to those areas within the City that are described in the Area Service Agreement or any amendments thereto.   The areas "within the City" described in the Area Service Agreement are as shown on the Area Service Agreement map outside the bold line and within the City. The "areas within the City" would also include any areas later annexed to the City that were named by an amendment to the Area Service Agreement.   Customers of [Capital Electric] within the

City in 1973 and any other customers specifically consented to by MDU would also be included under the express terms of the Area Service Agreement. [Capital Electric's] Franchise does not grant the authority to serve all new areas of the City that are outside the bold line on the map without amendment to the Area Service Agreement. The ability of the parties to execute new amendments ended on June 26, 2003, the effective date of cancellation of the Area Service Agreement by MDU.

[¶ 24] We conclude Bismarck's interpretation of the franchises ignores the plain language of the franchises. Nothing in the plain language of the franchises authorizes either entity to be the exclusive provider of electric service in Boulder Ridge upon annexation to Bismarck. Rather, the plain language of both franchises gives both entities a "non-exclusive" franchise in Bismarck as "now, or hereafter constituted." The plain language of MDU's franchise does not include any geographic limitations and does not preclude the extension of MDU's franchise to areas that are subsequently annexed to Bismarck, including Boulder Ridge. The geographic limitation in Capital Electric's franchise, with the attached map, specifically authorizes Capital Electric to serve the Boulder Ridge area, albeit before that area was annexed to Bismarck. The area service agreement specified that the "basic intentions of the parties [were] that each shall serve or offer service to the new consumers within their respective service areas," and Capital Electric's "principal service area" was the area outside the heavy dashed black line, which includes Boulder Ridge. Nothing in the plain language of the franchises indicates the parties intended the heavy dashed black line to move outward as Bismarck grew. Rather, the language of the geographic limitation in Capital Electric's franchise

specified that if the area service agreement were cancelled by either party during the term of Capital Electric's franchise, "all privileges, rights, obligations and restrictions as therein stated shall continue to apply to both" Capital Electric and MDU.

[¶ 25] Bismarck's reliance on extrinsic evidence from the early 1960s to show intent in 1973 and 1993 is misplaced, because contracts are construed to give effect to the parties' mutual intention "at the time of contracting." N.D.C.C. § 9–07–03. Capital Electric did not receive an electric franchise from Bismarck in the early 1960s; rather, Capital Electric first received a franchise from Bismarck in 1973, and the franchise was renewed in 1993.

[¶ 26] Moreover, the records on these appeals include evidence that between 2003 and 2005, Capital Electric served areas that had been annexed to Bismarck and were outside the heavy dashed black line on the map attached to the area service agreement without objection by Bismarck or MDU. In construing the scope of Capital Electric's franchise, the parties' practical interpretation of the franchise is entitled to some weight. *See* *Old Colony Trust Co.*, 230 U.S. at 118, 33 S.Ct. 967; *Western Elec. Co.*, 47 N.D. at 172–73, 181 N.W. at 369.

[¶ 27] We conclude the "non-exclusive" franchises, when construed as a whole and in conjunction with the area service agreement, authorize both Capital Electric and MDU to provide electric service in Bismarck as "now, or hereafter constituted" and Capital Electric's franchise does not preclude it from serving Boulder Ridge. The practical effect of interpreting the franchises to give both Capital Electric and MDU a franchise in the Boulder Ridge area is that the issue of unreasonable du-

plication is subject to the jurisdiction of the PSC under N.D.C.C. § 49–03–01.3 and this Court's decisions culminating in *Cass County Elec. Coop.*, 419 N.W.2d at 181, and *N.S.P.*, 452 N.W.2d at 340. In the absence of any explicit language providing otherwise, we believe that interpretation ultimately favors the public's interest in preventing unreasonable duplication of facilities, while recognizing a municipality's constitutional authority to grant a franchise. That interpretation does not interfere with Bismarck's constitutional authority to issue a utility franchise; rather, that interpretation recognizes that Bismarck has granted both Capital Electric and MDU a franchise for Boulder Ridge. We conclude Bismarck erred in construing Capital Electric's non-exclusive franchise to provide electric service in Bismarck as "now, or hereafter constituted" to preclude Capital Electric from providing electric service to Boulder Ridge. We hold that both Capital Electric and MDU have franchises to serve Boulder Ridge, and we reverse the district court judgment in Capital Electric's appeal.

### III

[¶ 28] In MDU's appeal from the district court judgment affirming the PSC's decision, MDU argues the PSC's decision failed to consider Bismarck's authority to franchise utility services within a city. Several of MDU's arguments are premised on the incorrect assumption that Capital Electric does not have a franchise to serve Boulder Ridge. To the extent MDU argues the PSC's decision failed to consider Bismarck's authority to franchise utility services in Bismarck, we reject those arguments because both Capital Electric and MDU have a franchise to serve the Boulder Ridge area involved in this proceeding. The PSC therefore has jurisdiction under N.D.C.C. § 49–03–01.3 and this Court's decisions in *Cass County*

*Elec. Coop.*, 419 N.W.2d at 181, and *N.S.P.*, 452 N.W.2d at 340.

[¶ 29] MDU also argues the PSC's findings of fact are not supported by a preponderance of the evidence and the PSC's findings do not sufficiently address MDU's evidence.

[¶ 30] An appeal from a decision by the PSC is governed by the Administrative Agencies Practice Act in N.D.C.C. ch. 28–32. *N.S.P.*, 452 N.W.2d at 342. Under N.D.C.C. § 28–32–46, a district court must affirm an administrative agency order unless:

1. The order is not in accordance with the law.

2. The order is in violation of the constitutional rights of the appellant.

3. The provisions of this chapter have not been complied with in the proceedings before the agency.

4. The rules or procedure of the agency have not afforded the appellant a fair hearing.

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

8. The conclusions of law and order of the agency do not sufficiently explain the agency's rationale for not adopting any contrary recommendations by a hearing officer or an administrative law judge.

[¶ 31] In an appeal from a district court's decision on an administrative appeal, this Court reviews the agency order in the same manner as the district

court. N.D.C.C. § 28–32–49. The agency's decisions on questions of law are fully reviewable. *Cass County Elec. Coop.,* 419 N.W.2d at 184. In reviewing an agency's findings of fact, however, we do not substitute our judgment for that of the agency or make independent findings. *N.S.P.,* 452 N.W.2d at 343; *Power Fuels, Inc. v. Elkin,* 283 N.W.2d 214, 220 (N.D.1979). In *Power Fuels,* at 220, we explained the constitutional underpinnings for our deferential standard of review of an agency's findings of fact:

> In construing the "preponderance of the evidence" standard to permit us to apply the weight-of-the-evidence test to the factual findings of an administrative agency, we do not make independent findings of fact or substitute our judgment for that of the agency. We determine only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record.

[¶ 32] The PSC's decision was issued under N.D.C.C. § 49–03–01.3 of the Territorial Integrity Act, which provides, in part:

> Sections 49–03–01 through 49–03–01.5 shall not be construed to require any such electric public utility to secure such order or certificate for an extension of its electric distribution lines within the corporate limits of any municipality within which it has lawfully commenced operations; provided, however, that such extension or extensions shall not interfere with existing services provided by a rural electric cooperative or another electric public utility within such municipality; and provided duplication of services is not deemed unreasonable by the commission.

[¶ 33] In *Cass County Elec. Coop.,* 419 N.W.2d at 186–87, this Court held that in determining interference with existing services and unreasonable duplication of services, the PSC must not look solely at actual customers in the area. Rather, the PSC must look at the existing electric facilities that the rural electric cooperative and the public utility have in place in the area and determine whether the extension of services into the area would constitute an unreasonable duplication of capital-intensive facilities and services provided by the other entity. *Id.* The question of " 'which electric suppliers' facilities are actually duplicative or wasteful' is one of fact for the PSC to determine." *N.S.P.,* 452 N.W.2d at 345.

[¶ 34] Here, the PSC found:

13. Before Boulder Ridge was platted and annexed to the City of Bismarck, Capital was the only provider of electric service in the part of Haycreek Township now named Boulder Ridge. Capital provided electric service to a location in Section 16 since 1949. In 2005 that service extension was removed in preparation for the development of Boulder Ridge. Capital had other services in Section 16, since the mid–1990s, still in place in 2005. Capital had three-phase lines along the west and south sides of Section 16 since 1973, still in place in 2005.

14. At the time Boulder Ridge was annexed, Capital's service in the subdivision was limited to two street lights and a CATV booster located in the road right-of-way along 43rd Avenue. Previous service to a pasture well by Capital within Boulder Ridge was abandoned prior to the annexation of Boulder Ridge.

15. Both Montana–Dakota and Capital extended distribution facilities to serve customer locations within Boulder Ridge. Montana–Dakota constructed its distribution facilities by extending a

three-phase feeder line approximately 2,000 feet from a location in French's Addition south of 43rd Avenue and east of Washington Street. Capital extended distribution facilities form [sic] its three-phase feeder lines location along Washington Street and 43rd Avenue. Montana–Dakota's extension of its underground feeder line crossed Capital's overhead feeder line along 43rd Avenue. Montana–Dakota was in the process of installing its facilities at the time Capital began installing its facilities.

16. Capital has a three-phase framework around the area of Capital's northwest Bismarck service area, served from 4 different substations. Capital's facilities nearest to Boulder Ridge are three-phase facilities immediately contiguous to Boulder Ridge along the west side of Section 16 (east of Washington Street) and along the south side of Section 16 (North of 43rd Avenue) of Haycreek Township. Capital's three-phase facilities were in place before Boulder Ridge was platted and before part of Boulder Ridge was annexed to the City of Bismarck. The facilities were also in place before Montana–Dakota extended its facilities to provide electric distribution services in Boulder Ridge.

17. Capital's feeder lines located along 43rd Avenue and Washington Street were built prior to 1973 to tie together Capital's substations at other locations. The use of these feeder facilities has not changed in the last 20 years. Prior to 1973, Capital did not have a franchise with the City of Bismarck or an Area Service Agreement with Montana–Dakota.

18. Capital has substantial facilities within the corporate limits of Bismarck and within a two-mile radius of Boulder Ridge and in the area designated as "The principal service area of the Coop-

erative [Capital]" under the 1973 Area Service Agreement.

19. Capital is the only provider of electric service in areas outside the corporate limits of Bismarck within a two mile radius of Boulder Ridge.

20. Capital included "The principal service area of the Cooperative [Capital]" under the 1973 Area Service Agreement in its long range plans and has made substantial investments to serve it. Capital has invested in excess of 7 million dollars in the area northwest of Bismarck, west of Highway 83, including Boulder Ridge. These facilities were planned and constructed to provide an electric system for new developments, such as Boulder Ridge.

21. Capital's framework is a reliable system of substations and distribution lines that can be operated in a looped fashion. In the event of an outage, Capital can provide looped service to Boulder Ridge. Capital's three-phase framework in the area northwest of Bismarck, west of Highway 83, is supplied from four different substations, the closest of which is within one mile of Boulder Ridge. Capital's system includes a 5th delivery substation under construction.

22. Montana–Dakota's facilities nearest to Boulder Ridge are in the southerly part of French's 1st Addition, approximately 1/2 mile from the southerly boundary of Boulder Ridge. It is off these facilities that Montana–Dakota extended its facilities to Boulder Ridge. Montana–Dakota has no other facilities closer to Boulder Ridge. Montana–Dakota's facilities in Boulder Ridge cannot be operated in a looped fashion in the event of an outage.

23. Montana–Dakota's extension of facilities into Boulder Ridge crossed Capital's facilities in two places, in French's 1st Addition and on the north

side of 43rd Avenue in Boulder Ridge and Montana–Dakota's extension of its facilities ran parallel to Capital's facilities in two places, in French's 1st Addition an[d] on the north side of 43rd Avenue in Boulder Ridge.

24. Boulder Ridge is entirely surrounded by areas served by Capital.

25. The Commission finds Montana–Dakota's extension of its facilities crossing and running parallel to Capital's facilities in the northerly part of original French's 1st Addition, crossing 43rd Avenue into Boulder Ridge, and crossing and running parallel to Capital's facilities on the north side of 43rd Avenue, interferes with and constitutes an unreasonable duplication of investment and available facilities and services in Boulder Ridge provided by Capital.

26. The Commission finds that service by Capital would best promote and serve orderly and economic development of electric service in the Boulder Ridge subdivision. Capital is able to extend service to Boulder Ridge through a shorter extension at a lower cost. Service by Capital to Boulder Ridge will not result in checker boarding of customers served by Montana–Dakota and Capital.

27. The Commission finds Montana–Dakota's extension of its facility to Boulder Ridge, an area not contiguous to Montana–Dakota's existing service areas, would create a checkerboard of service areas.

28. The Commission finds Capital is best able to serve Boulder Ridge economically due to the nature and extent of its investment in plant, facilities, framework, and system.

29. The Commission finds Montana–Dakota's extension of its electric distribution lines into Boulder Ridge 1st Addition interferes with and constitutes an unreasonable duplication of investment and services provided by Capital.

■■■ [¶ 35] Under our deferential standard of review of agency decisions, we conclude a reasoning mind reasonably could have decided the PSC's findings about interference with existing services and unreasonable duplication of services were supported by the weight of the evidence from the entire record. We do not reweigh or reevaluate the evidence regarding duplication that was presented at the PSC hearing, and we do not function as a super board and second guess the PSC's findings. We conclude the PSC's decision is supported by a preponderance of the evidence, and we affirm the district court judgment affirming the PSC's decision.

### IV

[¶ 36] Because of our resolution of these appeals, it is not necessary to address other issues raised by the parties. We reverse the district court judgment upholding Bismarck's decision that Capital Electric does not have a franchise to serve Boulder Ridge, and we affirm the district court judgment affirming the PSC's decision.

[¶ 37] CAROL RONNING KAPSNER, Acting C.J., WILLIAM F. HODNY, S.J., RONALD E. GOODMAN, S.J., and DANIEL J. CROTHERS, J., concur.

[¶ 38] The Honorable RONALD E. GOODMAN, S.J., and WILLIAM F. HODNY, S.J., sitting in place of VANDE WALLE, C.J., and MARING, J., disqualified.