896 F.Supp. 955 (1995)
DEVILS LAKE SIOUX INDIAN TRIBE, a Federally Recognized Indian Tribe, Plaintiff,
v.
NORTH DAKOTA PUBLIC SERVICE COMMISSION, et al., Defendants.
BAKER ELECTRIC COOPERATIVE, INC., a North Dakota Rural Electric Cooperative Association, Plaintiff,
v.
Joseph CHASKE, et al., Defendants.
SHEYENNE VALLEY ELECTRIC COOPERATIVE, INC., Plaintiff,
v.
DEVILS LAKE SIOUX INDIAN TRIBE, et al., Defendants.
SHEYENNE VALLEY ELECTRIC COOPERATIVE, INC., Plaintiff,
v.
OTTER TAIL POWER COMPANY, Defendant.
OTTER TAIL POWER COMPANY, Plaintiff,
v.
Bruce HAGEN, et al., Defendants.
Nos. A1-90-179, A2-90-176, A2-90-196, A1-92-049 and A1-92-065.
United States District Court, D. North Dakota, Northeastern Division.
January 10, 1995.
*956 Larry M. Baer, Ackre & Baer, Ctd., Cando, ND, for Baker Elec. Co-op., Inc.
Philip Baker-Shenk, Pirtle, Morisset, Schlosser & Ayer, Washington, DC, Robert L. Pirtle, Pirtle, Morisset, Schlosser & Ayer, Seattle, WA, Warren Sogard, Fargo, ND, for Joseph Chaske, Myra Pearson, Oliver Gord, Sr., Merrill Berg, Harold McGowan.
Philip Baker-Shenk, Pirtle, Morisset, Schlosser & Ayer, Washington, DC, Robert L. Pirtle, Pirtle, Morisset, Schlosser & Ayer, Seattle, WA, Warren Sogard, Mason D. Morisset, Morisset Schlosser Ayer & Jozwiak, Seattle, WA, for Devils Lake Sioux Tribe Tribal Utilities Com'n.
Philip Baker-Shenk, Pirtle, Morisset, Schlosser & Ayer, Washington, DC, Robert L. Pirtle, Pirtle, Morisset, Schlosser & Ayer, Seattle, WA, Mason D. Morisset, Morisset Schlosser Ayer & Jozwiak, Seattle, WA, for Devils Lake Sioux Indian Tribe.
William W. Binek, Charles M. Carvell, Bismarck, ND, for N.D. Public Service Com'n, Leo M. Reinbold, Dale V. Sandstrom, Bruce Hagen, State of North Dakota.

MEMORANDUM AND ORDER
CONMY, District Judge.
The above captioned actions involve one ripe issue and one rather esoteric question of tribal sovereignty. The ripe issue involves the right to provide electrical service to several tribal owned businesses or facilities. In an earlier opinion, this court determined that the Tribal Government had the inherent sovereign power to decide which utility supplier to patronize and to do so without regard to the North Dakota Territorial Integrity Law which purports to allocate consumer load between investor owned and cooperative utility suppliers.
*957 The immediate dispute was between Baker Electric Cooperative and Otter Tail Power Co. Otter Tail took a customer away from Baker by virtue of a Tribal resolution directing Otter Tail to provide service to a Tribal owned manufacturing plant. The North Dakota Public Service Commission, and eventually the North Dakota Supreme Court, determined that the Public Service Commission had the power to determine which supplier would service the plant, and the matter ended up with a daily fine accruing against Otter Tail when the PSC and the Court came down on the side of Baker and the precedence of the PSC and the Territorial Integrity act over Tribal authority.
Unfortunately, the issue became wonderfully muddled through the action of the Tribe in adopting a complex utility regulation scheme, and claiming that it had the sovereign power to regulate all electrical supply service everywhere on the reservation, without regard to land status (tribal owned, trust lands or fee lands) and also without regard to indian vs. non indian occupancy, usage or ownership. This writer was initially of the opinion that resolution of the cosmic issue of this claim was not necessary to the disposition of the actual issue presented  who gets to supply power to the Tribal owned business and facility. It appeared clear, and still appears clear, that the Tribe has the inherent sovereignty to contract with whomever it will for the provision of service to its lands and businesses. This sovereign power takes precedence over the actions of the State of North Dakota, for this specific type of usage on the reservation.
As the court previously noted, this may be an illusory power as any supplier must cross non-reservation areas to get power to the reservation, and must therefore be under North Dakota Public Service Commission jurisdiction until either the reservation boundary or the actual facility is reached. The court's previous ruling was however inappropriate in that the injunction restraining the PSC from levying a fine based upon the service of Otter Tail to the Tribal facilities was ordered dissolved. The injunction should have been made permanent only to the extent that the fine imposed upon Otter Tail was premised upon its provision of service to the manufacturing plant or to the headstart facility.
The Circuit Court of Appeals, however, refuses to let the court duck the issue of the Tribe's authority to establish a comprehensive utility regulation scheme, and has directed a rather specific analysis. As directed, the court recites as follows:

Facts
1. The Fort Totten Reservation, often referred to as the Devils Lake Sioux Reservation, was established by the Treaty of February 19, 1867, 15 Stat. 505.
2. Article 2 of the Treaty states in part:
"The said bands hereby cede to the United States the right to construct wagon-roads, railroads, mail stations, telegraph lines, and such other public improvements as the interest of the government may require, over and across the lands claimed by said bands, (including their reservation as hereinafter designated over any route or routes that may be selected by the authority of the Government.......)"
Article 9 states in part:
"And it is further agreed that no person, not a member of said bands, parties hereto whether white, mixed blood, or Indian, except persons in the employ of the Government or located under its authority, shall be permitted to locate upon said lands, either for hunting, trapping or agricultural purposes."
Article 10 provides:
"The chiefs and head-men located upon either of the reservations set apart for said bands are authorized to adopt such rules, regulations, or laws for the security of life and property, the advancement of civilization, and the agricultural prosperity of the members of said bands upon the respective reservations, and shall have authority, under the direction of the agent, and without expense to the Government to organize a force sufficient to carry out all such rules, regulations or laws, and all rules and regulations for the government of said Indians, as may be prescribed by the Interior Department: Provided, That all rules regulations, *958 or laws adopted or amended by the chiefs and head-men on either reservation shall receive the sanction of the agent."
3. The Fort Totten Reservation is located within 4 North Dakota Counties, Ramsey, Eddy, Nelson, and Benson. The majority of the acreage is in Benson County.
4. The Reservation covers 245,141 acres, of which 60,342 acres is owned by the United States as "trust land" for the benefit of the tribe or individual tribal members. 342 acres of U.S. government owned land are included in the 245,141. Individual Indians own 335 acres (Indian fee land) and the tribe itself owns 2,358 acres (Tribal fee land). The remaining 181,764 acres are owned in fee by non-Indian owners (non-Indian fee land), leading to the following percentages:

Trust land: 24.7
Indian owned fee lands: .0013
Non-Indian owned fee lands: 74.2
Federal Government fee lands: .0014
Tribal fee lands: 1.04
 Total: 100

Three fourths of all the land within the exterior boundaries of the Fort Totten Reservation is owned by non-Indians, in fee.
5. The percentage of non-Indian owned fee lands was slightly higher, but the policy of purchasing land by the Tribe has reduced the previous higher total.
6. Non-Indian owned fee lands within the reservation are subject to ad valorem taxation by the political subdivisions of the State of North Dakota, and thus three fourths of the lands comprising the Fort Totten Reservation are taxed by the respective counties, school districts, park districts and other political subdivisions wherein non-Indians have the right to vote, for the purposes of operating county governments, road maintenance, provision of schools under the control of school boards, park services, etc. In all respects except criminal jurisdiction distinctions between Tribal Court (misdemeanor jurisdiction over Indian defendants), Federal Court (misdemeanor jurisdiction over non-Indians committing offenses against indians and felony jurisdiction over Indians) and State Courts (misdemeanor and felony jurisdiction over non-Indian felons and non-Indian committed offenses against non-Indians), the non-Indian residents on non-Indian fee land are treated as if there were no reservation.
7. The 1990 census shows an Indian population on the Reservation of 2,276 and a non-Indian population of 903, with trends showing an increasing Indian population and a decreasing non-Indian population.
8. The primary reason for the lands of the Reservation passing from trust status to non-Indian fee status was a congressional policy of virtual abolishment of the reservations through allotment of 160 acre tracts to individual Indians (and conferring "citizenship" through such action), the sale of "surplus lands" and acts providing for the opening of certain areas to homesteading. "On June 2, 1904, President Roosevelt proclaimed the unallotted lands on the Devils Lake Reservation open to entry. In doing so he emphasized the fact that the Devils Lake Sioux had ceded all their unallotted lands without qualification. He informed prospective home-seekers that: "the said bands of said Indian tribe ceded, conveyed, transferred, relinquished, and surrendered, forever and absolutely, without any reservation whatsoever, expressed or implied, unto the United States of America, all their claim, title, and interest of every kind and character in and to the unallotted lands:" (Newell and Grant, Historical Review, appendix exhibit 1A) The clear policy of Congress not only over-rode the provisions of Article 9 of the 1867 treaty, excluding non-Indians, but from the period of 1890 through 1916 reflected the then policy of "integration", through land allotment, of the Indian into "the mainstream" of northern European culture. Virtually all allotted lands passed from Indian ownership, and the concept of "reservation" survived only because all of the "surplus lands" were not sold.
9. A second source of "leakage" from trust status of the eventually unsold "surplus lands" was the allowance of mortgaging of trust land interests, and, if justified, the foreclosure of the mortgage which converted the property into fee status.
10. The Tribe has adopted a comprehensive set of ordinances governing the affairs of the tribe, and has recently created an electrical *959 regulatory body which purports to have the authority to regulate rates and the provision of service to all customers within the exterior boundaries of the Reservation, without regard to the racial status of the customer or the nature of the land ownership of the premises served.
11. The North Dakota Public Service Commission currently regulates the provision of electrical service and the rates charged therefor by the "investor owned utilities", but not the cooperatives organized initially under the auspices of the National Rural Electric Administration Act, 7 U.S.C. §§ 901 et seq.
12. Historically, the investor owned utilities provided service to the more densely populated areas where the rate return better amortized the construction cost of the transmission facility. The co-ops, with government assistance, provided service to the scattered customers whose geographic dispersion required a greater investment per customer in service lines and equipment.
13. Again, historically, as communities expanded into what had previously been agricultural lands and major uses for power developed in these areas, tension was created between the power suppliers over the right to provide service to the newly developed areas. An outgrowth of this tension was the North Dakota "Territorial Integrity Act" (NDCC 49-03.1) which requires a permit to extend service lines into any area being served by another supplier.
14. The initial dispute between Otter Tail Power and Baker Electric Cooperative arose from the application of this law to the conflicting claims of the right to provide service to the Tribal manufacturing plant.
15. While the rates of the Cooperatives are not regulated by the Public Service Commission, the disparity in rates is usually small and in all probability offset by the patronage refund program, making claims of economic hardship with one supplier as against another virtually de minimis.
16. The "lifeline provision" in the regulations of the Public Service Commission prohibits the unilateral termination of service to a non-paying customer during the extreme winter months. While this regulation is not specifically applicable to the cooperatives, the court is advised that it is regularly followed in practice.
17. The incidence of alcoholism and unemployment are substantially higher for the Indian Reservation population than for the State population taken as an entirety, and the Tribal government has a valid governmental purpose in seeking to create employment opportunities through job development efforts such as the manufacturing plant and, more recently, the promotion of high stakes gambling activities.
18. In 1988, DTI, a tribal owned corporation, constructed a manufacturing plant within the Tribal Industrial Park in Fort Totten. The land on which the plant is located is Tribal trust land.
19. On September 14, 1988, the Tribe, by resolution, directed Otter Tail to supply electricity to the plant.
20. Baker Electric claimed the right to supply the plant, and in proceedings initiated before the North Dakota Public Service Commission, was successful in obtaining an order requiring Otter Tail to discontinue service to the plant. (Application of Otter Tail Power Company, 451 N.W.2d 95 (ND 1990).
21. The wisdom or lack thereof in the order of the North Dakota Public Service Commission is not in issue in this court, and the statements of the utility parties extolling the equities of the position of each as opposed to the other is a waste of paper. All three suppliers, Baker, Sheyenne and Otter Tail, have service facilities and customers on the Reservation.
22. Sheyenne Electric Cooperative is in a position identical to that of Baker following a resolution by the Tribe directing Otter Tail to furnish power to the Tribal Head Start facility in St. Michael's Mission.
23. The Tribe did not choose to solicit bids from Baker or Sheyenne on power rates.
24. The provision of electrical service is a complex and interrelated multistate business with numerous generating facilities contributing power to an interconnected grid.
25. Historically, the electrical distribution business has been a regulated monopoly as, *960 with the high cost of a distribution system, the construction of duplicate competitive systems destroys the very great economies of scale, and increases the cost to all consumers.
26. No one has shown any needs or pending requests for electrical service to any part of the reservation, or to any resident thereon, not being currently met by the existing systems.
No material facts necessary for the resolution of the matter are in dispute. With this factual background, and with the conviction that the investor owned utilities are using the Tribal sovereignty issue, and the Tribe, as a weapon against the territorial integrity act, the court makes the following analysis:

Treaty
Any attempt to predicate Tribal authority to regulate the distribution of electrical energy on the Reservation on the 1867 treaty requires creativity beyond rationality. The very limited authority given to chiefs and headmen to adopt rules and regulations for the governance of the Reservation required approval of big brother  the agent. Coupled with this limited authority was the language excluding non-indians, resulting in an Indian to Indian governance, if approved.[1]
In later years the pendulum swung all the way to the "dissolve the reservations and integrate the Indian" philosophy, with the result that the initial treaties were regularly stepped on by Congress, and what might have once been regarded as a unified territory with a common ethnicity of residents, became, after 1916, the checkerboard of ownership and occupancy blending state and local government services and controls with the present desire to preserve a base for Indian cultural preservation and self government. The argument of counsel for Otter Tail that the treaty right to exclude non-indians has not been abrogated by later congressional action is ludicrous.
Quite frankly, this writer is of the opinion that a review of the historical development of the Devils Lake Sioux Reservation leads to a conclusion that the allotment acts, the disposition of "surplus lands", the authority allowing alienation of allotted lands, and the result of 75% of the acreage within the original boundaries of the Reservation passing into non-Indian private ownership, evidences a clear Congressional intent to dissolve the reservation as a political entity. The courts have not reached that position, possibly out of shame for the wretched treatment accorded Indian interests when those interests conflicted with the position of some economic lobby over the preceding years. The result is the fact specific tap dance required whenever Tribal sovereignty issues are raised.
The authority to regulate the distribution of electrical services cannot be predicated upon a treaty.

Later Congressional Acts
Tribal powers derive from a treaty or acts of Congress. No specific statutory authority exists which authorizes regulation of electrical utilities. It is a reasonable interpretation of various statutes that the clear Congressional intent is the opposite  that the State of North Dakota has the authority to regulate. The Western Area Power Authority  WAPA  sells power to the grid serving all of the utility litigants. Otter Tail is a licensee under the Federal Power Act,[2] and is directed to "abide by" state regulations.
The Rural Electric Administration Act, 7 U.S.C.S. §§ 901 et seq. contains a requirement that the Coops function within state regulatory schemes. Tribal authority to regulate the distribution of electrical service on the reservation cannot be predicated upon later congressional acts.

Inherent Sovereignty
The general rule confines the exercise of Tribal sovereignty to the members of the tribeto those who have a political say in the governance of the Tribe and through those, loosely using the concept of "police power", to actions of others directly impacting upon the health and welfare of Tribal *961 members.[3] While never quite explicitly stated, the exercise of sovereignty has usually been approved only when the actions of members are regulated; the tax or fee or employment preference conditions are incorporated within a contractual arrangement with the tribal government; or the activity sought to be regulated directly affects the occupancy and usage of Indian owned or land in "trust status".[4]
The widely differing histories of the various Indian tribes and the various reservations has led to frequent use of terms general in nature, but applicable to each case only by reference to the specific facts of each case. The result is that both sides to a dispute cite the same case as authority for their side of diametrically opposed positions, and the quoted language appears to fit the position of each. It is only when the facts are analyzed in the context set out above, does the general language make sense.
The facts of this case present no justification for the exercise of regulatory authority over the provision of electrical service within the exterior boundaries of the reservation. No showing has been made, and by inference at least, can be made, that the health, welfare or safety of any Tribal Member is in any way threatened under the present system.[5] (One argument seems to be that the coops might shut off the power to some household for failure to pay for the services, and that the new tribal code would prohibit such action. The reality is that no power is so shut off at present, and the substitution of the rates paid by utilities customers in place of some social service program providing the funds to pay the bills is of questionable validity.)
The Court does feel however, that where the service sought is to a Tribal business located upon Trust land, the necessary nexus between Tribal Interests and inherent sovereignty is present.[6] As with most situations presenting the issue of where to draw the line between permissible and non-permissible exercises of Tribal powers, the location of the line is somewhat of a philosophical exercise. In a few years perhaps the entire issue will be passe in that the probable trend towards the de-regulation of electrical service will make the territorial integrity disputes merely interesting history.
With this attempt to provide to the Circuit the material upon which to seek error, the court concludes:
1. That Otter Tail is entitled to summary judgment on the issues between it and the North Dakota Public Service Commission, to the effect that the Tribe may by resolution or contract determine who is to supply electrical service to Tribal owned businesses located upon Indian owned or trust lands, without regard to the rate structure or other regulations of the North Dakota Public Service Commission, and the Public Service Commission is restrained from any sanctions against Otter Tail, or any future competitor, for providing such service. Nothing herein shall limit the power or authority of the North Dakota Public Service Commission except as to such service, present or future.
2. That the North Dakota Public Service Commission and utility parties are entitled to *962 judgment on the issue of the authority of the Tribe to regulate the distribution of electrical service within the exterior boundaries of the reservation, except as specifically provided above. The promulgation and enforcement of a reservation wide utility regulation scheme, without regard to land ownership, occupancy or use is beyond the sovereign authority of the tribe  under the fact specific situation present here.
SO ORDERED.
NOTES
[1] Treaty of February 19, 1867, 15 Stat. 505, Articles 9 and 10.
[2] Federal Power Act of 1935, Pub.L. 74-333, 49 Stat. 838.
[3] "[A] tribe may ... retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Eighth Circuit at page 23 of slip opinion No 93-1696, No 93-1699, No 93-1995, and No. 93-1707 filed July 1, 1994, quoting Montana v. United States, 450 U.S. 544 at 566, 101 S.Ct. 1245 at 1258 (1981).
[4] Montana v. United States, 450 U.S. 544, 565, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1981), Brendale v. Confederated Yakima Indian Nation, 492 U.S. 408, 426, 109 S.Ct. 2994, 3006, 106 L.Ed.2d 343 (1989).
[5] The Supreme Court, in Montana v. United States, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), set forth the two possible exceptions which would permit tribes to regulate the conduct of non-Indians within their reservation. A tribe may be able to regulate a non-Indian utility if there is a consensual relationship between the utility and the tribe or tribal members, or if the utilities' activities threaten the political integrity, economic security, or health and welfare of the tribe. Id. at 566-66, 101 S.Ct. at 1258.
[6] See Montana v. U.S., 450 U.S. 544, at 565, 101 S.Ct. 1245, at 1258 (1981).