2013 ND 158

**NORTH CENTRAL ELECTRIC COOPERATIVE, INC.,**
**Appellant**

v.

**NORTH DAKOTA PUBLIC SERVICE COMMISSION, Otter Tail Power Company, and Turtle Mountain Band of Chippewa Indians, Appellees.**

No. 20130075.

Supreme Court of North Dakota.

Sept. 3, 2013.

Debra L. Hoffarth, Minot, N.D., for appellant.

Ryan M. Norrell, Special Assistant Attorney General, Bismarck, N.D., for appellee, North Dakota Public Service Commission.

Paul R. Sanderson, Bismarck, N.D., and Bruce G. Gerhardson (on brief), Fergus Falls, MN, for appellee, Otter Tail Power Company.

Tracy L. Vigness Kolb, Bismarck, N.D., and Richard A. Monette (on brief), Madison, WI, for appellee, Turtle Mountain Band of Chippewa Indians.

KAPSNER, Justice.

[¶ 1] North Central Electric Cooperative appeals from a district court judgment affirming a Public Service Commission order dismissing North Central's complaint against Otter Tail Power Company after the Commission decided it did not have regulatory authority over Otter Tail's extension of electric service to a facility owned by the Turtle Mountain Band of Chippewa Indians on tribal trust land within the Turtle Mountain Indian Reservation. North Central argues (1) the Commission's decision is not in accordance with the law because the Commission has jurisdiction under North Dakota law and (2) the Commission's findings are not supported by a preponderance of the evidence and do not sufficiently address North Central's evidence. We affirm, concluding the Commission did not err in deciding it lacked authority to regulate the Tribe's decision to have Otter Tail provide electric service to a tribal-owned facility on tribal-owned land within the reservation.

I

[¶ 2] After the governing body of the Turtle Mountain Band of Chippewa Indians passed a resolution designating Otter Tail as the electric service provider to the Sky Dancer Casino, a tribal-owned business located on tribal trust land within the Turtle Mountain Indian Reservation, North Central filed a formal complaint against Otter Tail with the Commission, alleging Otter Tail's extension of service to the Sky Dancer Casino without a certificate of public convenience and necessity violated N.D.C.C. ch. 49–03. North Central alleged it had been supplying electric service to the Sky Dancer Casino since December 1998, and North Central provided electric service for construction work at the Sky Dancer Casino after the casino requested electric service for that work in

November 2011. North Central claimed it serves seven separately metered service entrances on the Sky Dancer Casino campus, Otter Tail's closest facility to the casino is a transmission line about 1,000 feet from the casino, Otter Tail's nearest retail customer is three miles from the casino, and Otter Tail began construction of an extension of its electric service to the casino on December 9, 2011, after the Tribe adopted a resolution requesting service from Otter Tail. North Central asserted Otter Tail's transmission lines would bore under State Highway 5 and cross North Central's distribution lines in the area. North Central alleged the Sky Dancer Casino was not located within the corporate limits of any municipality and Otter Tail's proposed service to the casino was a wasteful duplication and would unreasonably interfere with North Central's service system. North Central asked the Commission to enjoin Otter Tail from extending electric service to the Sky Dancer Casino.

[¶ 3] Otter Tail answered, admitting it had begun construction of a system to provide electric service to the Sky Dancer Casino and North Central had been providing electric service to the casino. Otter Tail claimed a certificate of public convenience and necessity under North Dakota law was not required because the Commission did not have regulatory authority over the Turtle Mountain Tribe's determination of the electric service provider for the tribal-owned facility on tribal land within the Turtle Mountain Indian Reservation. Otter Tail moved to dismiss North Central's complaint. North Central responded, claiming the Commission had authority to regulate electric service provided to the casino and seeking summary judgment because Otter Tail admitted beginning construction of facilities for service outside of a municipality without a certificate of pub-

lic convenience and necessity as required by N.D.C.C. ch. 49–03.

[¶ 4] The parties stipulated that the Sky Dancer Casino is a tribal-owned facility located on tribal trust property, that the Turtle Mountain Tribe passed a November 23, 2011, resolution requesting Otter Tail to provide electric service to the Sky Dancer Casino, that the Tribe has a long-standing tribal utility code, and that the Tribe informed the Commission "the Tribe is aware of this proceeding and . . . 'confirms that it is exercising its inherent sovereignty to determine which utility will provide electric service to Sky Dancer Casino' " under *Devils Lake Sioux Indian Tribe v. North Dakota Pub. Serv. Comm'n*, 896 F.Supp. 955 (D.N.D.1995). The Tribe thereafter intervened for the limited purpose of objecting to the Commission's jurisdiction, asserting the Tribe's inherent sovereignty to determine which utility would provide electric service to the Sky Dancer Casino.

[¶ 5] After hearing oral arguments on the motions, the Commission concluded it lacked regulatory authority over the Tribe's decision to authorize Otter Tail to provide electric service to the tribal-owned casino on tribal trust land within the Turtle Mountain Indian Reservation. The Commission denied North Central's motion for summary judgment and dismissed North Central's complaint. The district court affirmed the Commission's decision.

II

[¶ 6] An appeal from a Commission decision is governed by the Administrative Agencies Practice Act, N.D.C.C. ch. 28–32. *Capital Elec. Coop., Inc. v. City of Bismarck*, 2007 ND 128, ¶ 30, 736 N.W.2d 788. As relevant to this appeal, a district court must affirm a Commission order under N.D.C.C. § 28–32–46, unless:

1. The order is not in accordance with the law.

   ....

5. The findings of fact made by the agency are not supported by a preponderance of the evidence.

6. The conclusions of law and order of the agency are not supported by its findings of fact.

7. The findings of fact made by the agency do not sufficiently address the evidence presented to the agency by the appellant.

[¶ 7] In an appeal to this Court from a district court's decision on an appeal from a Commission decision, we review the Commission's order in the same manner as the district court. *See* N.D.C.C. § 28–32–49. The Commission's decision on questions of law is fully reviewable. *Capital Elec. Coop.*, 2007 ND 128, ¶ 31, 736 N.W.2d 788. In reviewing the Commission's findings of fact, however, we do not substitute our judgment for that of the Commission or make independent findings. *Id. See Power Fuels, Inc. v. Elkin*, 283 N.W.2d 214, 220 (N.D.1979). Rather, in reviewing the Commission's findings of fact, " '[w]e determine only whether a reasoning mind reasonably could have determined that the factual conclusions reached were proved by the weight of the evidence from the entire record.' " *Capital Elec. Coop.*, at ¶ 31 (quoting *Power Fuels*, at 220).

### III

[¶ 8] North Central argues the Commission's decision is not in accordance with the law, because the Commission has regulatory authority and jurisdiction over Otter Tail's activities under the Territorial Integrity Act, N.D.C.C. ch. 49–03. North Central argues the Commission erred in relying on *Devils Lake Sioux Indian Tribe*, 896 F.Supp. at 961, which held that

the Devils Lake Sioux Tribe may by resolution or contract determine which utility may supply electrical service to a tribal-owned business on Indian owned or trust lands within its reservation without regard to the rate structure or other regulations of the Commission. North Central asserts the federal district court's decision represents a misapplication of the overwhelming weight of authority on an Indian tribe's sovereign authority under *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) and subsequent cases. North Central argues the correct application of *Montana* requires a showing that a non-Indian's conduct would not merely injure but would imperil the subsistence of the tribal community, which was not shown in this case.

[¶ 9] The appellees argue the Commission properly decided it lacked authority over the Tribe's decision to have Otter Tail provide electric service to the tribal-owned casino on tribal trust land within the reservation, because tribal authority to regulate electric service to tribal trust land is an inherent and essential part of the sovereign authority of the Turtle Mountain Band of Chippewa Indians. Otter Tail argues the Commission's decision is consistent with *Devils Lake Sioux Indian Tribe*, which recognizes a narrow exception to state regulatory jurisdiction when regulation would interfere with a tribe's inherent authority to determine the electric service provider to a tribal-owned business on tribal trust land within a reservation. Otter Tail claims the Tribe's adoption of a utility code demonstrates the Tribe's inherent sovereignty to regulate activities affecting the Tribe's interests. Otter Tail asserts the Commission's decision is consistent with controlling precedent recognizing an Indian tribe's right to self-government and the inherent authority to govern activities on tribal land.

[¶ 10]   Under N.D.C.C. §§ 49–03–01 and 49–03–01.1, an electric public utility such as Otter Tail must obtain a certificate of public convenience and necessity from the Commission before extending electric service outside a municipality. *See Capital Elec. Coop., Inc. v. Public Serv. Comm'n*, 534 N.W.2d 587, 590 (N.D.1995); *Northern States Power Co. v. Public Serv. Comm'n*, 452 N.W.2d 340, 344 (N.D.1990). This case, however, involves the extension of electric service to a facility on an Indian reservation, and "[w]ithin Indian country state jurisdiction is preempted both by federal protection of tribal self-government and by federal statutes on other subjects relating to Indians, tribes, their property, and federal programs." *Winer v. Penny Enters., Inc.*, 2004 ND 21, ¶ 10, 674 N.W.2d 9 (quoting F. Cohen, *Handbook of Federal Indian Law* 349 (1982)). *See also Cohen's Handbook of Federal Indian Law* § 6.01 (Nell Jessup Newton ed., 2012).

[¶ 11]   A noted authority on Indian law describes the general principles for analyzing the interplay between tribal and state authority within Indian country:

> The general approach to determining which government has jurisdiction is relatively simple in the case of tribal member Indians in Indian country. Unless there is a specific federal law stating otherwise, they are subject to exclusive tribal jurisdiction. Congress's plenary authority over Indian affairs and the tradition of tribal autonomy in Indian country combine to preempt the operation of state law.
>
> . . . .
>
> When an issue affects the property or activities of non-tribal members or non-Indians in Indian country, the basic rule is subject to more exceptions. States may not assert civil jurisdiction over the conduct or property of non-Indians in Indian country if it would cause interference with tribal self-government or a conflict with federal laws and policies. When Indians or their property are not substantially affected, however, the courts have recognized that states have "legitimate interests in regulating the affairs of non-Indians."

In *Williams v. Lee*, [358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959),] the Supreme Court held that an Arizona state court did not have jurisdiction over a non-Indian's lawsuit to collect a debt incurred by a reservation Indian at a trading post on the reservation. The Court held that allowing the suit to proceed would undermine the authority of the tribal courts and therefore infringe on the tribe's ability to govern affairs on the reservation. Thus, an exercise of state jurisdiction over a transaction by a non-Indian with an individual Indian in Indian country can infringe on tribal self-government. This same reasoning applies to issues of state regulatory jurisdiction as well as judicial jurisdiction.

In contrast, when a dispute arises on non-Indian land (or its equivalent) in Indian country, the Supreme Court has curtailed tribal civil jurisdiction over non-Indians, unless the interests of the tribe or member Indians are affected. For disputes involving nonmembers on non-Indian land, this rule reverses the ordinary presumption in favor of tribal jurisdiction. Nevertheless, the Court recognizes that tribes retain inherent jurisdiction over non-Indians or non-Indian land when the non-Indians are involved in consensual relations with the tribe or its members or when substantial tribal interests are threatened. The Court has treated criminal jurisdiction differently, holding that by being subjected to the overriding sovereignty of the United States, tribes were divested of all their inherent power to try and

punish criminal offenses committed by non-Indians in Indian country.

*Cohen's Handbook on Federal Indian Law,* at § 6.01, pp. 489–91 (footnotes omitted).

[¶ 12]  In *Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), the United States Supreme Court stated the general rule for analyzing tribal or state authority over nonmembers on Indian land within a reservation, explaining, "absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." *See Cohen's Handbook on Federal Indian Law,* at § 6.03[2][a]. In *Williams,* 358 U.S. at 217–18, 79 S.Ct. 269, a non-Indian operating a trading post on a Navajo reservation sued a Navajo Indian and his wife in Arizona state court to collect for a debt incurred by them at the trading post.  The United States Supreme Court held the Arizona state court did not have jurisdiction over the non-Indian's action, explaining:

> There can be no doubt that to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves.  It is immaterial that [the trading post operator] is not an Indian.  He was on the Reservation and the transaction with an Indian took place there.  The cases in this Court have consistently guarded the authority of Indian governments over their reservations.  Congress recognized this authority in the Navajos in the Treaty of 1868, and has done so ever since.  If this power is to be taken away from them, it is for Congress to do it.

*Id.* at 223, 79 S.Ct. 269 (citations omitted).

[¶ 13]  Although the United States Supreme Court has generally upheld tribal authority over non-Indians on Indian land within a reservation, a tribe's authority to regulate conduct by non-Indians or nonmembers is more limited when the conduct occurs on property owned by non-Indians within Indian country, property which the Court has called non-Indian fee land.  *See Cohen's Handbook on Federal Indian Law,* at § 6.02[2][a] and [b].

[¶ 14]  In *Montana v. United States,* 450 U.S. 544, 563–67, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), the United States Supreme Court held the Crow Tribe did not have regulatory authority over hunting and fishing by non-Indians on land within the reservation held in fee by nonmembers of the Tribe.  The Court acknowledged the Tribe could regulate or prohibit nonmembers from hunting or fishing on land owned by the Tribe or held by the United States in trust for the Tribe, and if the Tribe permitted nonmembers to hunt or fish on those lands, the Tribe may condition their entry on those lands by charging a fee or establishing bag and creel limits.  *Id.* at 557, 101 S.Ct. 1245.  The Court explained, however, the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation," and "[s]ince regulation of hunting and fishing by nonmembers of a tribe on lands [within the reservation] no longer owned by the Tribe bears no clear relationship to tribal self-government or internal relations, the general principles of retained inherent sovereignty did not authorize the Crow Tribe" to regulate those hunting or fishing activities by nonmembers on non-Indian fee lands.  450 U.S. at 564–65, 101 S.Ct. 1245 (footnoted omitted).  The Court outlined what have come to be known as two *Montana* exceptions allowing an Indian tribe's assertion

of authority over nonmembers on non-Indian fee lands within a reservation:

> To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

450 U.S. at 565–66, 101 S.Ct. 1245 (citations omitted).

[¶ 15] Subsequent cases applying the *Montana* exceptions authorizing a tribe's assertion of jurisdiction over non-Indians on non-Indian fee lands generally have involved the *purported regulation of non-Indians on land acquired in fee simple by non-Indian owners within a reservation, land the Court has referred to as non-Indian fee land. See Plains Commerce Bank v. Long Family Land and Cattle Co., Inc.,* 554 U.S. 316, 320, 328–40, 128 S.Ct. 2709, 171 L.Ed.2d 457 (2008) (holding tribal court did not have authority to adjudicate Indian's discrimination claim concerning non-Indian bank's sale of non-Indian fee land to non-Indians); *Atkinson Trading Co., Inc. v. Shirley,* 532 U.S. 645, 647–59, 121 S.Ct. 1825, 149 L.Ed.2d 889 (2001) (holding tribe lacked authority to impose hotel occupancy tax upon non-Indians on non-Indian fee land within reservation); *Strate v. A–1 Contractors,* 520 U.S. 438, 442, 454–59, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997) (holding tribal court

lacked subject-matter jurisdiction to adjudicate lawsuit for car accident involving two nonmembers traveling on state highway, which was likened to non-Indian fee land, within reservation); *South Dakota v. Bourland,* 508 U.S. 679, 687–98, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993) (holding tribe lacked authority to regulate non-Indian hunting and fishing on lands taken by United States for construction of dam and reservoir).

[¶ 16] In *Nevada v. Hicks,* 533 U.S. 353, 355–65, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001), the United States Supreme Court held a tribal court lacked jurisdiction over a tribal member's action against state wardens in their individual capacities for conduct in executing a search warrant at a home owned by the tribal member within the reservation for a state crime allegedly committed off the reservation. The Court acknowledged that until that time, "the absence of tribal ownership has been virtually conclusive of the absence of tribal civil jurisdiction," but said the ownership status of the tribal member's home was only one factor to consider in determining whether regulation of nonmembers was necessary to protect tribal self-government or control internal tribal relations. *Id.* at 360, 121 S.Ct. 2304. The Court concluded "tribal authority to regulate state officers in executing process related to the violation, off reservation, of state laws is not essential to tribal self-government or internal relations-to 'the right to make laws and be ruled by them.'" *Id.* at 364, 121 S.Ct. 2304. The Court, however, expressly limited its decision to "the question of tribal-court jurisdiction over state officers enforcing state law." *Id.* at 358 n. 2, 121 S.Ct. 2304. *Hicks* did not apply the *Montana* exceptions; rather, the Court said tribal ownership was not enough alone to support tribal regulatory jurisdiction over nonmembers and analyzed the jurisdictional issue within

the context of whether tribal regulatory authority over the state wardens was "necessary to protect tribal self-government or to control internal relations." *Id.* at 360, 121 S.Ct. 2304. The Court's decision in *Hicks,* at 360–64, 121 S.Ct. 2304, essentially applied the general rule emanating from *Williams,* 358 U.S. at 220, 79 S.Ct. 269, that "absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them."

[¶ 17] *Montana,* 450 U.S. at 565–66, 101 S.Ct. 1245, and its progeny generally focus on non-Indian ownership of the land on which the nonmembers' conduct occurs while *Hicks,* 533 U.S. at 360–64, 121 S.Ct. 2304, recognizes that tribal ownership of the land, by itself, may not be enough for tribal regulatory authority over nonmembers' conduct if regulation of the nonmembers' action on that land does not infringe on the right of reservation Indians to make their own laws and be ruled by them.

[¶ 18] Here, the Turtle Mountain Tribe requested a nonmember, Otter Tail, to provide electric service to a tribal-owned casino on tribal trust land within the Turtle Mountain Indian Reservation. The parties stipulated and the Commission found the Sky Dancer Casino is a tribal-owned facility, the Sky Dancer Casino is located on tribal trust property, the Tribe "has a long-standing tribal utility code," and the Tribe passed a November 23, 2011, resolution authorizing Otter Tail to provide electric service to the Sky Dancer Casino.

[¶ 19] In *Baker Elec. Coop., Inc. v. Public Serv. Comm'n,* 451 N.W.2d 95, 97–107 (N.D.1990), a case in which the affected tribe did not appear and in which this Court held the utility did not have standing to assert the sovereign interests of the tribe, this Court issued a writ of supervision vacating a district court's writ of pro-

hibition that forbade the Commission to exercise its jurisdiction over the regulation of electrical service on the Fort Totten Indian Reservation. A concurrence by Justice Levine agreed the utility did not have standing to assert the affected tribe's self-government interests. *Id.* at 107–08 (Levine, Justice, concurring in result). Justice Levine said, however, that if the affected tribe had appeared, the narrow regulatory issue would have been whether the tribe may regulate a non-member utility providing electric power to a tribal-owned business on tribal-owned land within the reservation. *Id.* Justice Levine said the tribe had regulatory authority in those circumstances under language in the Supreme Court's decision in *Montana,* 450 U.S. at 557, 101 S.Ct. 1245, that a tribe could regulate hunting or fishing on land belonging to the tribe or held by the United States in trust for the tribe. 451 N.W.2d at 108.

[¶ 20] We must now decide whether *Baker Elec. Coop.,* governs our decision in this matter. Unlike *Baker Elec. Coop.,* the Turtle Mountain Tribe "has a long-standing tribal utility code" and has intervened in this proceeding to confirm that it is exercising its inherent sovereignty to determine which entity will provide electric service to the Sky Dancer Casino, a tribal-owned facility located on tribal trust property within the Turtle Mountain Indian Reservation. In *Baker Elec. Coop.,* at 97, 107, the Devils Lake Sioux Tribe did not appear in the proceeding in any manner and had not adopted a utility code. Although language in *Montana* indicates the Devils Lake Sioux Tribe had inherent sovereign authority to regulate nonmembers' conduct on tribal-owned land within the reservation, the Devil's Lake Sioux Tribe had not adopted a utility code and had no tradition of sovereignty over electric ser-

vice. *See Baker Elec. Coop.*, 451 N.W.2d at 107.

[¶ 21] In *Devils Lake Sioux Indian Tribe*, 896 F.Supp. at 957, 961, the Federal District Court for the District of North Dakota recognized the Devils Lake Sioux Tribe had adopted a utility regulation scheme for the entire reservation after this Court's decision in *Baker Elec. Coop.*, but found no justification for the Tribe's exercise of regulatory authority over the provision of electric service within the reservation under the circumstances of that case and the *Montana* exceptions. The federal district court acknowledged "the Tribe has the inherent sovereignty to contract with whomever it will for the provision of service to its lands and businesses, [which] takes precedence over the actions of the State of North Dakota, for this specific type of usage on the reservation." *Id.* at 957. The federal district court said "where the service sought is to a Tribal business located upon Trust land, the necessary nexus between Tribal Interests and inherent sovereignty is present" and concluded "the Tribe may by resolution or contract determine who is to supply electrical service to Tribal owned businesses located upon Indian owned or trust lands, without regard to the rate structure or other regulations of the. . . . Commission." *Id.* at 961. Contrary to North Central's claim, the result in *Devils Lake Sioux Indian Tribe* is not inconsistent with *Montana* and subsequent Supreme Court precedent on a tribe's inherent sovereign authority.

[¶ 22] We are now confronted with the narrow issue outlined by Justice Levine's special concurrence in *Baker Elec. Coop.* and considered by the federal court in *Devils Lake Sioux Indian Tribe.* We conclude the holding in *Baker Elec. Coop.* does not control the circumstances in this case involving a decision by a tribe with a long-standing tribal utility code to authorize Otter Tail to provide electric service to a tribal-owned entity on tribal-owned land within the reservation. The Tribe's decision authorizing Otter Tail to provide electric service to the tribal-owned facility on tribal trust land within the reservation represents the Tribe's control of its internal relations in the context of making its own laws and being ruled by those laws. The Tribe's regulatory decision to authorize Otter Tail to provide the electric service is tribal action within the context of its inherent tribal sovereignty under *Williams*, 358 U.S. at 223, 79 S.Ct. 269, without application of the *Montana* exceptions to non-Indian conduct on non-Indian fee land. *See Hicks*, 533 U.S. at 360–64, 121 S.Ct. 2304. *See also Devils Lake Sioux Indian Tribe*, 896 F.Supp. at 957–961. We conclude the Commission correctly applied the law and decided it lacked authority to regulate the Tribe's decision authorizing Otter Tail to supply electric service to the tribal-owned facility on tribal trust land within the reservation. As the federal district court did, we apply this analysis only to tribal-owned business on tribal trust or Indian owned land.

## IV

[¶ 23] We affirm the district court judgment.

[¶ 24] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, DANIEL J. CROTHERS and ALLAN L. SCHMALENBERGER, S.J., JJ., concur.

[¶ 25] The Honorable ALLAN L. SCHMALENBERGER, S.J., sitting in place of SANDSTROM, J., disqualified.